THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MITCHELL J. WEINGER, Defendant-Appellant.

First District (2nd Division)    No. 80-1936

Opinion filed October 27, 1981.

Donald Page Moore and Sherman C. Magidson, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Mitchell Weinger, was charged in a four count indictment with the murders of Mark Demetrius and Marigray Jobes. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1.) In a jury trial defendant was found guilty of both murders and, after a hearing in aggravation and mitigation, was sentenced to serve concurrent terms of 30 to 40 years in the Illinois Department of Corrections.

On appeal defendant contends: that prosecutorial misconduct deprived defendant of a fair trial; that the trial court erred in admitting evidence of prior consistent statements of the State's principal witness; that the trial court erred in excluding defense counsel from direct participation in the examination of potential jurors; and that this court should reconsider its prior decision in *People v. Weinger* (1978), 63 Ill. App. 3d 171, 379 N.E.2d 810, which upheld the validity of a search warrant issued in this cause. For the reasons which follow, we reverse defendant's convictions and remand the cause for a new trial.

Shortly after 11:30 p.m. on Monday, March 1, 1976, Mark Demetrius and his girlfriend, Marigray Jobes, were stabbed to death in Marigray's apartment at 2970 North Sheridan Road in Chicago. The State's principal witness was Cedric Sberna.

Sberna testified that he knew both victims and that he had been a "close" friend of Mark for about six weeks before the murders. On

Tuesday, February 24, 1976, Sberna loaned Mark $3,000 in cash and told him that he "needed it back within 30 days." Sberna stated that he did not know what Mark intended to do with the money. On Sunday morning, February 29, Sberna, Mark and Mark's girlfriend, Marigray Jobes, went to brunch together. Early that afternoon, William P. Wright, Jr., a professional pilot, met Mark, Marigray and defendant at the Palwaukee airport.

Wright testified that he flew the threesome to the Playboy Club in Lake Geneva, Wisconsin. Mark met for a few minutes with an "older man" with whom he appeared to be having an argument near one of the hangars. Mark was carrying a 9 mm pistol at the time. Wright, Marigray and defendant remained in the plane and talked while they waited for Mark. When Mark returned, all four flew back to Palwaukee. Late Sunday night Wright and a friend, Carlo Nelson, visited Mark at Marigray's apartment. Wright and Nelson arrived sometime between 10:30 and 11 p.m. and stayed for two and one-half hours. The only persons present in the apartment were Wright, Nelson, Mark and Marigray.

Sberna testified that at approximately 10 p.m. on Monday, March 1, 1976, he telephoned Mark at Marigray's apartment. He then drove the 30 miles from his home in Lake Forest to Marigray's apartment on North Sheridan Road. Mark's sister, Cynthia Demetrius, testified that Mark called her at 11 p.m. and mentioned that he had spoken with Sberna on the telephone. Mark told Cynthia that he (Mark) was "high."

Sberna testified that he arrived at Marigray's apartment at 11 p.m. Mark appeared to be intoxicated but was "in a good mood." On the table in the apartment were a bag of cocaine, a small cylindrical glass vial, a large mirror, a large bowl of water and a cocked 9 mm pistol which Sberna had, on other occasions, seen in Mark's possession. Mark instructed Sberna to throw the cocaine into the water in the event the police raided the apartment. Sberna knew that Mark used and dealt in cocaine and that Marigray assisted him.

A conversation ensued during which Sberna advised Mark to "calm down" and stop "acting crazy." According to Sberna, Mark had been using "quite a bit" of cocaine and was "out of control" "flying around throwing parties, wasting money." Mark admitted that he had been wasting a lot of money (which Sberna believed was the money he had recently loaned him) but assured Sberna that he would be able to pay back immediately at least part of the amount he owed him by selling some cocaine. Mark told Sberna that he knew someone who would pay $125 per gram of cocaine which was substantially more than its street value. Mark made a telephone call which he told Sberna was for the purpose of arranging a drug sale. After the call, Mark removed the bag of cocaine from the table and prepared two smaller glassine bags of cocaine.

He then gave the larger bag to Sberna and asked him to hold it for him and keep it away from him. As collateral for Sberna's loan of February 24, Mark also handed him his wristwatch which was made from a $20 gold piece. Mark's sister, Barbara Demetrius, testified that Mark called her at approximately 11:30 p.m. and sounded as if he was "high" on drugs.

At 11:30 p.m., which was 20 minutes after Mark had made his call to arrange a drug sale, defendant arrived at Marigray's apartment. Sberna testified that defendant was wearing an Antarctic parka with a hood and fur trim, and brown gloves. Defendant did not remove his parka while he was in the apartment. Mark informed defendant that the cocaine on the table was the same cocaine that defendant had tried before and invited him to test it. Defendant, however, picked up Mark's pistol and waved it in the air, but Mark took it away from him and put it on a shelf next to the table in the apartment. Defendant then tested a small sample of the cocaine by placing it in a vial filled with water and watching the resulting solution.

According to Sberna, he and Mark had an understanding that Mark would not engage in any drug deals in Sberna's presence. In keeping with that understanding, Mark took defendant into the bathroom. Sberna and Marigray remained in the living room and saw Mark come out once to get his wallet. Mark "seemed to be in a very good mood. He was skipping and hopping and smiling." He then returned to the bathroom. "Two seconds later," Sberna heard a "choking and gurgling" sound. Sberna and Marigray ran to the bathroom door. Sberna opened the door a crack, looked in and saw defendant standing by the door and Mark lying on the floor in a pool of blood. Sberna also saw what appeared to be a very large butcher knife in defendant's hand. Sberna backed away and yelled to Marigray to get Mark's pistol. Marigray handed the gun to Sberna who then told defendant to come out. Defendant said that they (defendant and Mark) had just "got into a little bit of an argument and that he'll be okay and they'll both be right out." Neither came out of the bathroom. Sberna ordered defendant to drop the knife and come out. Defendant said, "I won't come out unless you drop the gun." Sberna refused and repeated his order to defendant to drop his knife and leave the bathroom.

While Sberna was trying to make defendant leave the bathroom, Marigray was screaming, "Mitchell, Mitchell, get out of there, leave the apartment, let's take care of Marky. Get out of here." Sberna asked Marigray to call the police. She picked up the telephone but then set it down without dialing. Defendant told Sberna that he was a narcotics agent and that there were three more narcotics agents waiting outside. Upon hearing this, Sberna took the bag of cocaine Mark had given him and threw it to Marigray, expecting her to place the cocaine in the bowl of water. Instead, Marigray placed it under her leotards at her crotch. Sberna advised

Marigray that he was going to leave the apartment and asked her to go with him. Marigray refused to leave and kept shouting at defendant, calling him "Mitchell." Sberna assured Marigray that he "would call her right back immediately."

Sberna left the apartment with the loaded gun and did not try to summon help from any of the nearby apartments or from passersby on Sheridan Road. Sberna walked to his car which was parked a half block away and drove to a nearby tavern. He called the apartment but received no answer. He did not call the police at that moment because he "thought the police were already there, being that he [defendant] was a narcotics agent." Sberna drove back to the area of the apartment to see if there was any activity. He drove up and down five streets in the neighborhood but saw no activity of any kind.

Sberna then drove downtown to the Ritz-Carlton Hotel at Water Tower Place where his girlfriend, Micky Carlyle, was employed as a cocktail waitress. He arrived at the hotel at 12:15 a.m. and parked his car. Sberna went up to "The Bar" on the twelfth floor where Carlyle worked, ordered a cognac and waited a couple of minutes until she appeared. Sberna related certain facts to Carlyle. Carlyle testified that Sberna was "extremely upset" and had told her that "Mark had been stabbed and he didn't know what to do." Both Carlyle and another waitress confirmed that there were no bloodstains on Sberna's clothes.

Carlyle suggested that Sberna talk with a friend of hers who attended medical school. She dialed the number and Sberna spoke with the student for a few minutes. Sberna then called the Chicago Police Department's emergency number, 911, at 12:30 a.m.

Sberna testified to the contents of the two minute call. The call was recorded and a tape of it was played to the jury. In the call, Sberna told the police that he had witnessed a murder or attempt murder by a man with an 11-inch knife. He said that he had seen his friend lying on the bathroom floor with blood all over and left because he was in fear for his life. Sberna did not tell the police that he had a fully loaded pistol with him at the time of the crime. Sberna said, "I don't even know what the hell is going on here, but this guy is nuts. He is nuts." Sberna gave the police the address where the stabbing took place and advised them that the apartment was under the name of "M. Jobes." He also said that he was calling from the Ritz-Carlton but hung up without giving his name. In the call, Sberna did not identify the attacker by the name "Mitchell" and said that he did not know "the chick" who leased the apartment. At trial, Sberna attributed this omission to the fact that he was nervous, but in another part of his testimony he said that he had lied because he was "in confusion." Sberna did not tell the police that the man in the apartment had identified himself as a narcotics agent because by the time he made

the telephone call, Sberna had time to think and "assumed that he [defendant] was not a narcotics officer."

Sberna and Carlyle drove back to Marigray's apartment but saw no police cars there. The police communications officer, James McNichol, testified that he had not ordered any police units to report to the scene because he thought Sberna's call was a "prank." Sberna looked into the window of the apartment and saw Marigray's body lying on the floor covered with blood. According to Carlyle, Sberna said, "Tinker [Marigray] got it. She's lying in a pool of blood." Carlyle also stated that after viewing Marigray's body, Sberna became ill and vomited. Carlyle and Sberna drove back to her apartment where she called a lawyer she knew, Jared Kelner.

Kelner also testified for the State. At the time of trial Kelner had been suspended from the practice of law for reasons unrelated to this case. Kelner arrived at Carlyle's apartment at approximately 1:30 a.m. and spoke with Sberna privately in the bathroom where Carlyle could not hear them. Sberna testified that Kelner told him that he was doing his laundry and had to get back to his building to change machines. Sberna dropped Kelner off at his apartment, then drove around the neighborhood for a few minutes looking for a place to dispose of the pistol which he had left in his car. Finally, he threw the gun down a sewer on Astor Street.[1] The weapon was ultimately recovered, identified and admitted into evidence. Sberna picked Kelner up and drove back to Carlyle's apartment where they talked further. Kelner testified that he advised Sberna not to call the police. Kelner also advised Carlyle not to speak with the police.

Mark's father, Andrew Demetrius, testified that at approximately 9:30 a.m. on Wednesday, March 3, 1976, two days after the killings, he telephoned Sberna looking for Mark. Demetrius had a business appointment with Mark on Tuesday, but Mark did not appear and could not be reached by telephone. Demetrius asked Sberna if he knew where his son was. Sberna told him he did not know, that he had tried to call Mark on Monday evening but was unable to reach him. At trial Sberna admitted that he had lied to Demetrius. Demetrius testified further that since he was still worried about his son after speaking with Sberna, he drove to Marigray's apartment. He had the custodian open the door and found Marigray's body in the living room and his son Mark's body in the bathroom. The custodian called the police.

---

[1] At trial Kelner disputed Sberna's reason for going back to Kelner's apartment. Kelner said they went to his apartment so that he could make himself look more presentable professionally. Before they left Carlyle's apartment, Kelner also asked Sberna if he had a weapon on his person. Once Sberna admitted that he did, Kelner told Sberna that he would not speak with him until Sberna had rid himself of the gun.

In court Demetrius identified for the State two items of physical evidence offered to connect defendant with his son. One was Mark's appointment book which was discovered inside Marigray's apartment. That book contained the name "Mitchell" and defendant's telephone number. Demetrius also identified a photograph of defendant and defendant's wife which was found among his son's belongings at the Demetrius' home in Glenview.

Investigator Richard Morask testified that he went to Marigray's apartment after the bodies were discovered. He observed blood "all over the apartment" but saw no signs of forced entry. On Mark's body Morask found a wallet with seven $100 bills. On the dresser he found another $100 bill and a watch made from a $20 gold piece. The bodies were removed to the morgue where the medical examiner, Dr. Robert Stein, performed the autopsies.

Dr. Stein testified that there were multiple stab wounds and cuts on both bodies, including defensive wounds on Marigray's left hand. Both victims died of stab wounds to the chest. Chemical analysis of the body fluids revealed that both victims had consumed significant quantities of alcohol, cocaine and Quaaludes. A small bag of cocaine was found in Demetrius' shirt pocket and another bag of cocaine was discovered in Jobes' vagina.

The police called Sberna at his residence in Lake Forest about 5 p.m. on Wednesday, March 3, 1976. According to Sberna, the police advised him that Mark Demetrius and Marigray Jobes were dead and that the police wanted to speak with him at Area 6 headquarters. After this telephone conversation, Sberna called Kelner and asked him to meet him at Area 6. Before he left for the police station, Sberna called Andrew Demetrius and related to him what the police had just told him on the telephone. Sberna did not inform Demetrius of what he knew about the incident. Instead, he asked Demetrius to tell him what the police had told Demetrius regarding the crimes. Sberna's recollection of his conversation with Demetrius was hazy. Demetrius, however, testified that Sberna told him that the police were accusing him of the murders. According to Demetrius, Sberna said, "I think the police think I did this." Investigator Skelly confirmed that Demetrius later reported this to him. Demetrius assured Sberna that he would "back him up" because he could not believe that Sberna had anything to do with the murders.

Sberna arrived at the police station at 8 p.m. Present were his father, his brother and sister-in-law and Kelner who was then acting as Sberna's attorney. Sberna testified that he had not seen Mark and Marigray since brunch on Sunday, February 29. When the police asked Sberna if he had seen either of them after Sunday, Sberna declined to answer on the advice of his attorney and refused to respond to any more questions. Sberna,

however, did inform the police that he knew of no illegal activities in which Mark and Marigray were involved. At trial he admitted that this statement was untrue since he knew that both used and dealt in drugs.

Late Wednesday or Thursday evening (March 3 or 4) the police attempted to interrogate Carlyle at Area 6 headquarters. In testimony which was corroborated by homicide investigator John Toenings, Kelner stated that he met Carlyle at the station and advised her not to speak with the investigators. Carlyle testified that she refused to answer any questions at that time.

Kelner testified that on Friday, March 5, 1976, Micky Carlyle told him that she had changed her mind and was going to cooperate with the police investigation. Kelner then withdrew from representing Carlyle but was present at Area 6 when Carlyle gave an oral statement to the police. On the same date investigator Philbin told Kelner that he had obtained a tape recording of Sberna's call to the police the night of the murders. After Kelner informed Sberna of these developments, Sberna decided, against Kelner's advice, to speak with the police. Sberna testified that on Friday evening, March 5, he related to the police "substantially the same things" he later testified to at trial.

The police traced the telephone number found in Mark's appointment book at Marigray's apartment to defendant's address and arrested him there as he drove into his parking garage at approximately 12:30 a.m. on Saturday, March 6. Sberna identified defendant in a lineup.

Investigator Theodore O'Connor testified that after defendant was arrested, he waived his *Miranda* rights and told O'Connor that he knew Mark Demetrius but did not know a girl named Marigray Jobes. He had, however, read newspaper accounts of the murders. Defendant told O'Connor that he had last been at the scene of the murders on Sunday night, February 29. Mark had called defendant at home and asked him to come to Mark's girlfriend's apartment. Defendant went there because he wanted to repay Mark $40 that he owed him. When defendant arrived at the apartment, Mark, his girlfriend and another person were present. Defendant tried some cocaine Mark's girlfriend offered him, had a brief conversation with Mark, then left.

O'Connor testified further that defendant denied being at the apartment late on the evening of March 1 or in the early morning hours of March 2. Defendant stated that he was playing cards with his friend, Steven Glassman, between 10 p.m. on March 1 and 2 a.m. on March 2. Defendant invited the police to contact Glassman to verify his alibi. They did, and Glassman denied that defendant was with him.

Glassman testified that on Wednesday or Thursday, March 3 or 4, before defendant had been arrested, defendant telephoned him and asked Glassman to tell anyone who called, "like my wife," that on

Monday night he was playing cards at Glassman's house. On other occasions Glassman had agreed to "cover" for defendant and assured him that he would this time also. Glassman, however, testified that defendant was not with him at the time of the murders.

Investigator John Toenings testified that after obtaining a search warrant, he and four other officers searched defendant's apartment. They recovered a message form on which the name "M. Demetrius" and Marigray Jobes' telephone number were written; an article about the murders cut from the front page of the three star final edition of the Chicago Tribune for March 4, 1976; 13 keys; and a beaded choker. In the jury's presence Toenings identified each one of these items, including the choker.

Defendant did not testify in his own behalf but called two Chicago police investigators, Thomas Skelly and James Philbin, to perfect impeachment of Sberna. Skelly testified that Andrew Demetrius had told him that he had called Sberna on Wednesday, March 3, 1976, looking for Mark, and that Sberna informed Demetrius that he had not seen Mark or been at the home of Mark's girlfriend since Sunday, February 29. Philbin testified that Sberna had told Philbin that he expected Mark "to make up the money" he owed him by selling cocaine. Philbin also related some minor inconsistencies in Sberna's account of the murders themselves.

Defendant was found guilty of both murders and was sentenced to serve concurrent terms of 30 to 40 years in the penitentiary.

## I

Defendant's principal argument on appeal is that the misconduct of the prosecutors deprived defendant of a fair trial. We are constrained to agree. In our judgment the prosecutors in this case failed to manifest a proper regard for the trial court's evidentiary rulings and for the defendant's constitutional right to a fair and impartial trial. In a veritable litany of errors, defendant cites 35 instances of alleged prosecutorial misconduct. While no single act would necessarily require reversal and not all are worthy of individual comment, we are unable to conclude that the cumulative impact of the following errors did not affect the jury's verdicts:

■■ (1) In his opening statement the prosecutor told the jury that the only eyewitness, Cedric Sberna, would testify that when defendant arrived at Marigray's apartment, he was wearing "a turquoise necklace, shell necklace, * * *." The prosecutor then informed the jury that the police had recovered "a turquoise shell necklace" from defendant's apartment. Sberna, however, did not testify that defendant wore a necklace. The prosecutor's suggestion that he would so testify was therefore error. "[T]he prosecutor cannot comment during his opening statement upon

what testimony will be introduced at trial and then fail to produce such testimony. Such arguments and comments effectively assert the prosecutor's own unsworn testimony in lieu of competent evidence." *People v. Rogers* (1976), 42 Ill. App. 3d 499, 502-03, 356 N.E.2d 413.

We recognize, as the State observes, that the prosecutor's failure to produce evidence referred to in the opening statement does not invariably prejudice a defendant. (*People v. Sanders* (1980), 81 Ill. App. 3d 1001, 1004-05, 401 N.E.2d 1103; *People v. Allen* (1959), 17 Ill. 2d 55, 63, 160 N.E.2d 818.) The error in this case, however, was particularly egregious because of what transpired later in the trial: over the strenuous objections of defense counsel and only after the prosecutors intimated that they would "tie it up," investigator Toenings was allowed to testify that investigator Philbin had found "a choker, a beaded choker" in defendant's apartment. The prosecution then produced the turquoise choker and Toenings identified it for the jury. Subsequent to this identification, however, the State introduced no evidence that defendant had worn the necklace.

■■ We believe that the prosecutors' conduct was improper and prejudicial. The State offered no testimony to substantiate the prosecutor's representation in his opening statement that defendant was wearing "a turquoise necklace, shell necklace." Despite the absence of such testimony, the prosecutors insisted upon bringing to the jury's attention evidence that a turquoise "beaded choker" had been discovered in defendant's apartment. We are aware that the necklace was ultimately excluded from evidence and was not argued to the jury. Nevertheless, the prosecutors succeeded in creating the erroneous impression that Sberna's identification of defendant had been independently corroborated by the seizure of an article of jewelry from defendant's apartment. Thus, the jury reasonably could have believed that there was a critical piece of physical evidence placing defendant at the scene of the crimes when, in fact, no such evidence was introduced.

(2) In closing argument, the prosecutor stated:

"* * * [T]hey [the police] look through this phone book and find the name Mitchell with a phone number. They trace the phone number and they go and arrest the defendant who fits the physical description given by Cedric Sberna.

Mr. Magidson: Objection, if the Court please.

The Court: Sustained.

[Assistant State's Attorney]: If there was anything different about any kind of description, you'd have heard about it, ladies and gentlemen, I guarantee you that."

In rebuttal, the prosecutor argued:

"The most interesting aspect of all the evidence in the case, and especially the arguments, is that Mr. Magidson and his fellow attorneys never once, from the beginning to the end, asked Mr. Sberna to describe the man who came in that apartment. Not once. They didn't want that description to come out.

Mr. Magidson: Object.

[Assistant State's Attorney]: They didn't want you to hear that description—

The Court: Sustained.

[Assistant State's Attorney]: —because, see, that's him. That's Mitchell Weinger. That's what the description was. Mitchell Weinger."

In our opinion, these comments were improper since there was no testimony that Sberna gave a physical description of defendant to the police. To suggest otherwise, then "guarantee" that defendant fit "the description" was prejudicial. "[I]t is error sufficient to reverse a judgment to permit counsel to state, against objection, matter not in evidence and pertinent to the issue or to assume arguendo facts to be proven when they are not." *People v. Connors* (1980), 82 Ill. App. 3d 312, 320, 402 N.E.2d 773.

The State, however, argues that the foregoing remarks were a reasonable inference from the evidence that the police arrested defendant as soon as he drove into the parking garage of the building in which he lived: "Obviously the police had obtained a description of defendant from someone, * * *. Since the police started looking for defendant only after talking to Cedric Sberna it was a reasonable inference from the evidence that Sberna had given the police an accurate description of defendant."

■■ It would be equally reasonable to infer that the police had obtained the license plate number and a description of defendant's vehicle, or that the parking attendant at the garage with whom the police spoke prior to the arrest described or identified defendant for the officers. Reasonable inferences must be based on facts properly in evidence. The State could not argue the inference that Sberna's description was accurate when the factual predicate for that inference, *i.e.*, that Sberna provided a description, was never proved.

(3) Again, in rebuttal, the prosecutor stated:

"* * * Much is said by Mr. Magidson [defense counsel] about what the witnesses testified to, but very little is said about what they were not allowed to testify to.

Mr. Magidson: Object to what they were not allowed to testify to.

The Court: Sustained."

■■ By this comment the prosecutor apparently implied that defense counsel had prevented the State from eliciting evidence which would have proved damaging to defendant if it had been admitted. (From the

context of his argument, the prosecutor was referring to Sberna's conversations with Carlyle and Kelner on the night of the murders.) This reference to excluded evidence was error. "The remarks that the jury was not allowed to hear certain evidence because of defendant's objections were utterly improper and have been repeatedly held to be reversible error." *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 18, 351 N.E.2d 402.

We cannot accept the State's contention that the prosecutor's comment was invited by defense counsel's closing argument. We have examined that argument and find nothing in it which would justify the prosecutor's allusion to evidence not properly before the jury.

(4) In rebuttal, the prosecutor also stated:

> "Ladies and gentlemen of the jury, the evidence that we, the representatives of the People of this State, have presented to you is uncontradicted and undenied."

■■ This remark was erroneous and improper.[2] At trial the defense called two homicide investigators to complete the impeachment of Sberna by his prior inconsistent statements. One of these officers also related certain discrepancies between Sberna's trial testimony and his earlier statements to the police regarding the circumstances of the murders themselves.

In light of this testimony, the prosecutor could not properly make the unqualified statement that the State's evidence was "uncontradicted." "Where the State's case is not in fact unchallenged, the suggestion that it is becomes suspect; it is not 'an accurate summary of the evidence.' [Citation.] The only reasonable point to the comment is the defendant's silence." (*People v. Escobar* (1979), 77 Ill. App. 3d 169, 178, 395 N.E.2d 1028.) The State, of course, may not comment on a defendant's silence. *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; Ill. Rev. Stat. 1979, ch. 38, par. 155—1.

The error here was exacerbated by the prosecutor's use of the word "undenied," which the State makes no attempt to justify on appeal. "[W]hile 'uncontradicted' is a colorless word, and could apply to almost anyone, 'undenied,' though not *per se* impermissible [citation] points more at the defendant: anyone can contradict anything, but one denies an accusation." (*Escobar*, at 178.) The prosecutor's comment may well have suggested to the jury that its attention should be focused on the defendant's failure to take the stand. (*People v. Connors* (1980), 82 Ill. App. 3d 312, 322, 402 N.E.2d 773.) Such a suggestion is not permissible.

(5) On cross-examination, Jared Kelner, who had advised both Sberna and Carlyle not to speak with the police, volunteered the fact that he had once attended a course in law school taught by defense counsel

---

[2] Although the trial court sustained defense counsel's objection, it refused counsel's request to instruct the jury to disregard the remark. See *People v. Thomas* (1980), 89 Ill. App. 3d 592, 603, 411 N.E.2d 1076.

Sherman Magidson. On redirect, the prosecutor examined Kelner as follows:

"Q. Mr. Magidson was one of your teachers in law school, is that it?

A. That's correct.

\* \* \*

A. Initially, I felt responsible to Mr. Sberna and Miss Carlyle.

Q. And on Friday, you terminated your feelings of responsibility for Miss Carlyle, is that right?

A. Yes, that's true.

Q. And you were acting as a criminal defense attorney, weren't you, sir?

Mr. Magidson: Objection—

The Court: He may answer—

The Witness: Yes, I was.

[Assistant State's Attorney]: Much the same way Mr. Magidson is acting in this case, your former teacher?

Mr. Magidson: I'll object and move that that be stricken, if the Court please, and I'd like to be heard.

The Court: We'll strike that.

Mr. Magidson: May I be heard?

The Court: Not at this time. You may proceed.

[Assistant State's Attorney]: So, on that day, throughout that entire week, the only person you felt responsible for was your client, Mr. Sberna, is that right?

A. Basically, that is true.

Q. And ethically speaking, isn't that what criminal defense attorneys are all about?

Mr. Magidson: I'll object to that.

The Court: Sustained. Strike that."

On further redirect, the prosecutor inquired:

"Well, let's see. Was it a criminal case you were taught by Mr. Magidson?

A. Yes, it was.

Q. It was criminal?

A. The example was a criminal case, yes, it was.

[Assistant State's Attorney]: I probably thought it was. No further questions.

Mr. Magidson: Well, may counsel's comments about what he thinks be stricken?

The Court: We'll strike both counsels comments. Jury is to disregard both. \* \* \*."

In closing argument, the prosecutor returned to the theme of his redirect examination:

"You also heard from Kelner, former attorney. Suspended attorney. What kind of advice, what kind of course did you learn in law school that teaches you to subvert a police investigation. To stonewall it. To disallow witnesses to a murder, to a double homicide to talk and tell the police what they know."

In rebuttal, the prosecutor stated, "\* \* \* I'm not going to dwell on Kelner. He [Magidson] was his [Kelner's] teacher, not mine."

■■ The foregoing questions and comments were, in our judgment, improper. Regardless of the professional propriety and evidentiary significance of Kelner's advice, which is not in issue here, the prosecutors' statements may well have had the effect of discrediting defense counsel Magidson in the eyes of the jury. First, the prosecutors informed the jury that neither Kelner, nor Magidson, nor any other defense attorney feels any ethical responsibility to anyone except his own client. Then, the prosecutors insinuated that Magidson had taught Kelner how "to subvert a police investigation."

We cannot accept the State's argument that "the whole matter was too trivial to have had any effect on the trial." The State bases this argument on the fact that at the time the case was tried, Kelner had been out of law school for at least six years. According to the State, "[n]o juror was going to blame Kelner's corruption of spirit, if any, on the fact that he had taken one course from Sherman Magidson." We question, however, what the prosecutor intended the jury to believe when, in closing argument, he asked, "What kind of advice, what kind of course did you learn in law school that teaches you to subvert a police investigation \* \* \*."

(6) On more than 20 occasions in this trial the prosecutors persisted in asking witnesses to answer questions to which the trial court had already sustained defense objections. Most of these questions apparently were intended to elicit evidence which, either directly or indirectly, would support the credibility of the State's principal witness, Cedric Sberna.[3] The prosecution's tactic of repeating questions ruled objectionable by the trial court was evidently calculated to cast defense counsel in the role of obstructionists who were trying to keep damaging evidence from the jury. This type of conduct has been condemned as "reprehensible." *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 18, 351 N.E.2d 402.

The State initially maintains that the repetition of the questions was not improper or prejudicial because the trial court's rulings excluding the evidence were in error. But as the court noted in *Snyder v. Sotta* (1970), 3 Wash. App. 190, ___, 473 P.2d 213, 215, "[t]he proper procedure upon the sustaining of an objection is to present the anticipated response by an

---

[3] The questions focused on Sberna's statements to Kelner and Carlyle after the murders and on Sberna and Carlyle's explanation for refusing to aid the police investigation.

offer of proof outside the presence of [the] jury—not by continuing to question in a vein held objectionable by the court." The State, however, argues that in the instant case the expected answers were obvious and, therefore, no offers of proof were necessary. The State argues further that since it cannot appeal from a not-guilty verdict which may result from the improper exclusion of evidence, offers of proof, if made by it, would have served no useful purpose.

■■ Stripped of its rationalizing veneer, the State's argument asserts, in effect, an absolute, unilateral right to determine questions of admissibility: since the State cannot appeal a verdict of not guilty, it should be free to override the evidentiary rulings of the trial court when, in the State's opinion, those rulings are in error. This argument is an invitation to anarchy in the courtroom and should not be countenanced. No party in a lawsuit, civil or criminal, may assume the right to violate or ignore the court's rulings and orders. "Right or wrong, the ruling of the court is the law of the trial, and it is the duty of parties and counsel to accept it as such. This is recognized as the law everywhere." *State v. Felch* (1918), 92 Vt. 477, ___, 105 A.2d 23, 27. See also *In re Dellinger* (7th Cir. 1974), 502 F.2d 813, 816.

■■ The State has offered no acceptable justification for the prosecutors'. refusal to abide by the trial court's rulings, and we are aware of none. The prosecutors' persistent defiance cannot be excused on the ground that they may have believed the trial court to be in error. That excuse is refuted by the State itself when it acknowledges that "a prosecutor cannot decide for himself what is admissible evidence."

■■ We have carefully examined the entire record in light of defendant's contentions and are compelled to conclude that the misconduct of the prosecutors deprived defendant of his constitutional right to a fair and impartial trial. We have no doubt that the evidence presented by the State was sufficient to sustain defendant's convictions in a trial free from prejudicial error. When considered as a whole, however, we cannot say that the many trial errors which we have reviewed were harmless beyond a reasonable doubt or that they did not contribute to the convictions. (*People v. Weathers* (1975), 62 Ill. 2d 114, 120-21, 338 N.E.2d 880.) For that reason, defendant's convictions must be reversed and the cause remanded for a new trial.

## II

Defendant also contends that the trial court erred in receiving evidence of four prior consistent statements of Cedric Sberna. The four statements were: (1) Sberna's testimony relating the substance of his emergency call to the police at 12:30 a.m. on Tuesday morning, March 2,

1976; (2) a tape recording of that call; (3) Sberna's testimony that his statements to the police on Friday, March 5, 1976, were "substantially similar" to his testimony in the courtroom; and (4) Jared Kelner's testimony that Sberna's statements to the police on Friday, March 5 "about what he knew about this case" were "nothing different" from what Sberna had told Kelner in Mary Carlyle's bathroom when Sberna first consulted Kelner early Tuesday morning, March 2, 1976.

The State does not dispute defendant's contention that the third statement was improperly admitted into evidence. The State, however, vigorously takes issue with defendant's contention regarding the admissibility of the other three. The State contends that the first two statements were admissible either as excited utterances, or, in the alternative, as prior consistent statements to rebut a charge of recent fabrication, and that the fourth statement was also admissible as a prior consistent statement. The State contends further that all of Sberna's statements on the night of the murders, including the ones he made to Carlyle and Kelner which the trial court excluded, were admissible as prior consistent statements.

Whether any of these statements, including the ones which the trial court excluded, should, if offered, be admitted on retrial cannot be determined by reference to the trial record which is now before us. Since we are remanding this cause for a new trial on other grounds, we do not consider further the admissibility of these statements but merely enunciate the applicable general principles which may guide the trial court in a new trial.

■■ To bring a statement within the spontaneous declaration ("excited utterance") exception to the hearsay rule, three factors are necessary: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804.) In determining spontaneity, both the time which elapsed between the occurrence and the declaration, and the distance which the declarant traveled from the scene are material, but neither factor is controlling. (*People v. Cherry* (1980), 88 Ill. App. 3d 1048, 1053, 411 N.E.2d 61.) The pertinent point is whether there was a lack of sufficient time to allow an opportunity for reflection and invention. (*Poland*, at 181.) The court must consider all the circumstances surrounding the statement to determine whether it is reasonable to believe that the declarant acted without thought, or whether there existed the possibility that the declarant had deliberated in making a false statement. (*Cherry*, at 1054.) A statement which qualifies as a spontaneous declaration is admissible to prove the truth of what was said. *People v. Damen* (1963), 28 Ill. 2d 464, 471-72, 193 N.E.2d 25.

■■ To rebut a charge or an inference that a witness is motivated to

testify falsely or that his testimony is a recent fabrication, evidence is admissible that the witness told the same story before the motive came into existence or before the time of the alleged fabrication. (*People v. Clark* (1972), 52 Ill. 2d 374, 389, 288 N.E.2d 363; *People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409.) Such evidence may be considered only as corroboration and not as substantive evidence of guilt. *People v. Hudson* (1980), 86 Ill. App. 3d 335, 340, 408 N.E.2d 325.

### III

Defendant contends further that the trial court erred in excluding defense counsel from direct participation in the examination of potential jurors. Since this argument concerns the proper interpretation of Supreme Court Rule 234 (Ill. Rev. Stat. 1979, ch. 110A, par. 234) and may also arise in a retrial, we address it here.

Supreme Court Rule 234 provides:

> "The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions."

Rule 234 is made applicable to criminal trials by Rule 431. Ill. Rev. Stat. 1979, ch. 110A, par. 431.

Defendant concedes that these rules have been held constitutional (*People v. Jackson* (1977), 69 Ill. 2d 252, 260, 371 N.E.2d 602), but argues that exclusion of direct questioning by counsel is arbitrary unless there exists (a) some showing of delay or prejudice to the selection process resulting from permission to counsel to ask questions, or (b) a specific finding to that effect by the trial judge, if the basis for his conclusion does not otherwise appear of record. "Arbitrary exclusion," according to defendant, "misconstrues the rules or else renders them unconstitutional as construed and applied." We disagree.

The plain language of Rule 234 indicates that the trial court is to institute voir dire after which the court "*may* permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or *may* permit the parties to supplement the examination by such direct inquiry as the court deems proper." (Emphasis added.) (See Committee Comments, Ill. Ann. Stat., ch. 110A, par. 234, at 178 (Smith-Hurd 1981 Supp.).) The Historical and Practice Notes point out that the amended rule was intended "to put the trial judge exclusively in charge of the voir dire examination unless he chooses to permit the parties or their

attorneys to participate." (Ill. Ann. Stat., ch. 110A, par. 234, at 178 (Smith-Hurd 1981 Supp.).) Consistent with the intent of the rule, the courts have uniformly held that the trial court has the primary responsibility for conducting the voir dire examination. *People v. Sanders* (1980), 87 Ill. App. 3d 708, 713, 410 N.E.2d 182; *People v. Dallas* (1980), 85 Ill. App. 3d 153, 165, 405 N.E.2d 1202; *People v. Brumfield* (1977), 51 Ill. App. 3d 637, 644, 366 N.E.2d 1130.

■■ In light of the language, purpose and history of Rule 234, it is apparent that defendant's interpretation of the rule is untenable. No showing of delay or prejudice is necessary for the trial court to exclude direct questioning of prospective jurors by counsel. Moreover, although defendant contends that such an interpretation renders the rules "unconstitutional as construed and applied" this contention was disposed of in *People v. Jackson* (1977), 69 Ill. 2d 252, 260, 371 N.E.2d 602. There the supreme court, citing numerous authorities, held that the constitutional right to an impartial jury does not require that the parties themselves be permitted to interrogate the jurors. See also *People v. Lobb* (1959), 17 Ill. 2d 287, 301, 161 N.E.2d 325.

IV

In 1977 Circuit Court Judge Albert Green quashed a search warrant for defendant's apartment and suppressed the evidence seized under the warrant's authority. On the State's appeal we reversed that order. (*People v. Weinger* (1978), 63 Ill. App. 3d 171, 379 N.E.2d 810.) Defendant's subsequent petitions for leave to appeal and *certiorari* were denied. (*People v. Weinger* (1978), 71 Ill. 2d 621; *Weinger v. Illinois* (1979), 441 U.S. 923, 60 L. Ed. 2d 396, 99 S. Ct. 2032.) Defendant asks us to reconsider and overrule our prior decision. This we decline to do.

■■ Under the "law of the case" doctrine, this court is now bound by the particular views of law announced in our prior opinion in this case, unless the facts presented in the subsequent proceedings are so substantially different as to require a different interpretation (*Turner v. Commonwealth Edison Co.* (1978), 63 Ill. App. 3d 693, 698, 380 N.E.2d 477; *City of Lockport v. County Board of School Trustees* (1976), 42 Ill. App. 3d 578, 580, 356 N.E.2d 420), or unless, in the interval between appeals, a higher court has made a contrary ruling on the precise issues of law on which we based our earlier opinion. (*Yonan v. Oak Park Federal Savings & Loan Association* (1975), 27 Ill. App. 3d 967, 971, 326 N.E.2d 773; *Presbyterian Distribution Service v. Chicago National Bank* (1962), 36 Ill. App. 2d 1, 4, 183 N.E.2d 525.) Neither exception is applicable here. We therefore refrain from reconsidering our earlier opinion upholding the validity of the search warrant issued in this cause. See *Department of Transportation v. Western National Bank* (1978), 69 Ill. 2d 576, 581, 373 N.E.2d 14.

For the foregoing reasons, the judgments are reversed and the cause is remanded for a new trial.

Reversed and remanded.

HARTMAN, P. J., and DOWNING, J., concur.