THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL HOBBS, Defendant-Appellant.

First District (1st Division)   Nos. 1—87—3476 through 1—87—3478 cons.

Opinion filed July 6, 1992.

64

Randolph N. Stone, Public Defender, of Chicago (Shelton O. Green, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (David Stabrawa and Caren J. Armbrust, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Michael Hobbs was convicted of burglary and sentenced to three years' probation, with the first six months in Cook County Department of Corrections. Defendant argues on appeal that: (1) he was denied his constitutional right to a fair trial; (2) the prosecutor's misstatement of the law denied him a fair trial; and (3) the trial court's ruling denied his constitutional right to a fair trial.

On December 20, 1986, defendant Michael Hobbs and his accomplices (Roosevelt Martin, James Ward and Shawn Hobbs) were arrested after fleeing from property of the Illinois Central Gulf Railroad while being pursued by Officers Soukup and Krull. Officer Soukup testified that on December 20, 1986, he was employed as a railroad policeman with the Illinois Central Gulf Railroad at 31st Street and Damen in Chicago. He testified that he was responsible for protecting the sealed trailers located on the property.

Soukup testified that, as he left the railroad yard traveling southbound on Wood Street, he observed two vans, one blue and the other white, travelling in front of his car. The blue van pulled over to the left side of Wood Street and the white van pulled over to the right side of Wood Street. Soukup stated that he travelled one block past the vans and wrote down the license plate number of the blue van, parked his car, then surveyed the vans through his binoculars. He stated that the area was well lighted and that there were no obstructions blocking his view. Soukup stated that he observed two black male passengers in the blue van and two black male passengers in the white van. Soukup radioed for assistance, and Officer Krull responded to the call.

After Officer Krull arrived at the scene, he and Officer Soukup continued to maintain surveillance of the two vans for about 25 minutes. Soukup testified that he observed one passenger (later identified as Roosevelt Martin) exit the blue van from the driver's side and walk north toward the railroad tracks, while the second occupant exited the white van, walked north and met the driver of the blue van. They then walked toward the railroad track. Soukup drove his car one block from where defendants were, climbed an embankment and followed after the defendants as they walked down the tracks. Officer Krull remained in the car and kept surveillance of the offenders who remained in the blue van.

Soukup testified that he later noticed the men on property adjacent to the railroad's property pulling apart a chain link fence. Soukup stated that accomplice James Ward climbed through the hole and walked down an embankment onto the railroad's trailer facility. Hobbs and Martin remained by the fence. Soukup testified that he viewed Ward through his binoculars break the seal on five trailers, enter inside each one for a few seconds, then exit and close the rear door.

Soukup testified that after Ward entered a fifth trailer, Hobbs and Martin approached the trailer and the three unloaded boxed merchandise from one trailer and carried it to the fence where the hole had been created. The men made about six trips from the trailer to the fence. Soukup stated that Hobbs then began walking back towards the van parked on Wood Street. Martin and Ward remained stationed at the fence with the merchandise. Soukup stated that he then notified Krull that Hobbs was headed back toward the van, and he also notified the Chicago police department.

Soukup testified that he remained on the elevated tracks and continued to monitor Hobbs through binoculars. Hobbs walked to the blue van, which was parked on Wood Street, opened the door, and then he and the passenger walked over to the white van. Soukup stated that the passenger was much shorter than Hobbs and appeared to be a juvenile. Hobbs then started the van, turned on his headlights as Officer Krull drove his vehicle forward and Soukup immediately approached the scene from the rear of the white van.

Soukup testified that he learned the younger man's name was Shawn Hobbs, the brother of Michael Hobbs. Soukup stated that Shawn Hobbs entered the white van and sat in the back seat, while Michael Hobbs sat in the driver's seat. Both were arrested. A Chicago police officer summoned Detective Dwyer, who answered the call and

was advised by Soukup that the men had been arrested for burglary and that there were two additional subjects in the area.

Detective Dwyer remained at the scene with Hobbs, while Officers Soukup and Krull drove back to the area of the railroad property where the merchandise had been removed from the trailers. Soukup stated that he observed the other two men there, and the merchandise was stored near the embankment by the hole in the fence. As Officers Soukup and Krull approached the area, Ward and Martin fled. Soukup and Krull left their vehicle and pursued them on foot. Ward ran toward the van, but Martin ran westbound on the railroad tracks. They continued to pursue Ward, but not Martin. Ward later collapsed in an alley, was arrested and transported to the station. An assisting officer apprehended Martin.

Officer Soukup returned to the area where the merchandise was stacked. He stated that a hole large enough for three adult persons to fit through appeared in the fence separating the Illinois Motor Service parking lot from the Illinois Central Gulf Railroad property. Seals from the trailers were also lying on the ground. Soukup stated that photographs were taken of the merchandise before it was taken back to the original trailers. Soukup testified that approximately 35 boxes were removed from the trailers valued at $4,000. He stated that he never recovered any tools from the scene that would have been used to break the seal on the trailers.

Detective Dwyer testified that about 3 a.m. on December 20, 1986, he answered a call for assistance and drove to Archer and Wood Street. He pulled his car up to the white van, where the railroad police were standing with two men. He stated that a second van was across the street facing southward. Dwyer stated that he was advised that the men were being held for burglary and was asked to hold them while Officers Krull and Soukup went back onto the railroad property. Dwyer stated that he waited with the two men until other officers arrived. He then turned the men over to the other officers because he was outside his area. Dwyer identified Michael Hobbs in open court.

Officer Rogers testified that about 2:50 a.m. on December 20, 1986, he and his partner answered a call for assistance at Archer and Wood Street in Chicago. Rogers stated that when they arrived at the scene, Detective Dwyer was standing near a white van with two men in custody. Rogers identified Michael Hobbs in open court. Rogers stated that he handcuffed them and placed Shawn Hobbs in the back seat of their vehicle and Michael Hobbs in another car that arrived on the scene. Rogers left on foot to assist Officers Krull and Soukup,

while his partner and a second officer remained with the Hobbs brothers.

Rogers stated that, as they approached the railroad tracks, he observed Martin at the top of the railroad tracks who began to run. Rogers pursued him on foot, and Martin was eventually apprehended. Rogers identified Martin in open court.

Wendy Harris testified that about 11 p.m. on December 19, 1986, she and Ward left her home in his blue van headed for a party at 57th Street and Stewart. Wendy stated that they arrived at the party about 12 a.m. where they saw Michael Hobbs collecting money at the door. They left the party about 12:30 p.m. and headed for White Castle at 31st Street and Ashland. Wendy testified that on their way they stopped at 51st Street and Laflin, where they met Martin and his friend Betty. Wendy stated that after leaving White Castle the four drove back to the party.

Wendy claimed that en route the van broke down at Ashland and Archer Street. Ward and Martin exited the van and, after inspecting it, they pushed the van around the corner to Wood Street. The four then walked back to White Castle. Harris stated that Ward asked several persons for a jump, but no one assisted them. Ward then made a telephone call home to ask for help. Wendy stated that the four then walked back to the van, where they remained 20 minutes, and after no one came, Ward and Martin walked Wendy and Betty to a bus stop at Ashland. Wendy stated that this occurred about 2:20 a.m., and they did not see Martin and Ward after that time.

Sandra Ward testified that about 12:30 a.m. on December 20, 1986, she was preparing for bed when she received a telephone call from Ward. After receiving the call, Sandra walked next door to Michael Hobbs' home, told him that Ward and Martin were stranded, and Hobbs placed a car battery in his white van and then left. Sandra testified that she received another telephone call about 2 a.m. from Hobbs.

Michael Hobbs testified that about 12 a.m. on December 20, 1986, he was at home assisting his brother in collecting money at a party. He stated that Ward and Wendy came to the party and left about 12:30 a.m. Hobbs claimed that he told Ward to bring Martin back to the party. He testified that later that morning he had a conversation with Sandra Ward, then went to her home to get a battery for Ward. He claimed that he placed the battery in his van, then he and someone named Woody left the party.

When he arrived at Archer and Wood Street, Ward's van was facing north and no one was inside. Hobbs claimed that he walked over

to the van, looked inside and found no one there. He then changed the battery. He testified that after he changed the battery he walked to a gas station on Damen and Archer to make a telephone call to Sandra. He stated that he told Sandra to advise Ward that the battery had been changed, then drove back to the van to get Shawn Hobbs.

Hobbs testified that as he and Shawn drove away from the van, a police officer stopped them at the corner of Archer and Wood Street. He stated that he saw Martin walk toward the van at that time, and after the police shouted "Hold it, police," Ward ran and Martin threw his arms out. Hobbs claimed that he never went onto the property of the Illinois Central Gulf Railroad tracks, nor did he climb through any hole in the fence on that embankment. He also claimed that he never removed any property from the trailers in the yard.

Hobbs stated that the person he was with that night was no relation to him. On cross-examination he was asked "To your knowledge the police didn't know who Woody was or his name either, did they?" Hobbs responded that he did not know.

Roosevelt Martin testified that about 12:30 a.m. on December 20, 1986, he and his girl friend Betty left his home headed for a party. He stated that Ward and his girl friend Wendy picked them up in Ward's van and drove to the party. On their way to the party, they stopped at White Castle and the van broke down at Archer and Wood Street. He stated that he and Ward unsuccessfully attempted to start the van and eventually pushed it onto Wood Street. All four then walked back to White Castle, where Ward asked several customers for a jump. He claimed that it took about 15 minutes to walk to White Castle, that he called Michael Hobbs from there, and that he and Ward walked back to the van.

Martin stated that they waited at the van about 15 minutes. They then walked the two women to a bus stop at Ashland and Archer. Martin testified that after leaving the women, they then walked back toward the van and a police officer placed a gun in his face and told him to put his hands in the air.

Martin denied ever being on the Illinois Central Gulf Railroad property, climbing through any fence, and carrying any boxes from the trailers.

On cross-examination Martin stated that there was a gas station not far from where the van broke down, but that he did not push the van into that gas station.

John Isorio testified that about 1:15 a.m. on December 20, 1986, he was inside White Castle when Ward approached him and requested

a jump for his vehicle. Isorio declined to give Ward a jump, but he did give him the telephone number of a friend who was a mechanic. Isorio stated that he had never seen Ward before that morning, nor did he ever see the vehicle.

Officer Krull testified that on December 20, 1986, he was employed by the Illinois Central Gulf Railroad as a patrolman on the 11 p.m. to 7 a.m. shift. About 1 a.m. that morning he received a radio communication from Officer Soukup and went to Archer and Wood Street to survey two vans. Krull stated that both vans were facing south and were occupied with two persons in each one. Krull testified that he used binoculars to enhance his view. Krull stated that about 10 minutes after he arrived, one of the occupants exited the blue van. He stated that there were no women present in the van.

Krull testified that two individuals left the white van, and one person left the blue van and walked north on Wood Street. Officer Soukup followed the three while Krull kept the vans under surveillance. Krull eventually received a telephone communication from Officer Soukup telling him that one of the men was returning to the van. He stated that when the man returned to the van a second man exited the blue van and the two walked over to the white van.

Krull testified that he then drove his vehicle and blocked the van, and exited as Officer Soukup came to assist him. Krull stated that the defendants were arrested, told him that their names were Michael and Shawn Hobbs, and that he turned them over to Detective Dwyer.

Krull and Soukup then drove down Wood Street to the railroad embankment, where he saw Martin and Ward crouching down over boxes. As the officers drove up, the defendants ran. The defendants were apprehended, arrested and placed in the custody of the Chicago police department. Krull testified that he returned to the area where the defendants were first observed and inspected the holes in the south and north fences. Krull described the holes in the fence as "man-size." He stated that he never saw anyone cut a hole in the fence, nor did he see anyone remove boxes from the railroad yard. He did, however, identify Ward and Martin at trial.

Defendant Michael Hobbs argues that certain actions by the assistant State's Attorney denied him a fair trial. He first contends that the State ignored and violated the court's rulings and implied to the jury that it was being prevented from introducing important evidence.

During redirect examination of Charles Soukup, the State elicited answers from Soukup that would have revealed to the jury that prior burglaries had occurred at the railroad property. During a sidebar the court instructed the State not to ask questions that concerned any

burglaries other than the one for which defendant was on trial. After admonishment by the court, the prosecutor asked three other questions of the witnesses which defendant challenges; these were:

"Q. Without talking about any event that might have happened prior to December 20th \*\*\*. \*\*\*

\* \* \*

Q. Well, without telling us about the prior events of December 20th \*\*\*. \*\*\*

\* \* \*

Q. They [the fences] had been cut on the prior occasion, right?"

Defendant also asserts that the State made reference to the prior burglaries during closing argument.

■ We first note that defendant did not raise this issue in a post-trial motion and, therefore, has waived it on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Assuming it has not been waived, we do not find that the State violated the trial court's ruling. Prosecutorial misconduct occurs when the State ignores a trial court's ruling and continues the line of questioning ruled on by the court. (*People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924.) The trial court's ruling here admonished the State to refrain from eliciting testimony that prior burglaries had occurred. The State's questions to Soukup were aimed at eliciting the conditions of the fence prior to the burglary for which defendant was on trial. Officer Soukup's testimony established only that there had been prior damage to the fence, not that defendant was the offender, nor that other burglaries had occurred at the Illinois Central Gulf Railroad.

Defendant also contends that the State committed reversible error by implying in its questions that he had previously been involved in the burglary of the railroad property and used the same exact point of entry on this particular occasion. The statement which defendant bases his allegation on is:

"Q. [Assistant State's Attorney]: \*\*\* There was a hole from a previous occasion in the exact location of the south fence that you saw defendants going through on this particular occasion [right]?"

Defendant asserts that the reasonable implication to be drawn from the statement was that defendant must have committed the prior burglary and the one for which he was on trial.

■ While it is improper for a prosecutor to proffer evidence of other crimes than the one for which defendant is charged, a prosecutor can argue any logical inferences that can be drawn from the evi-

dence. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) The question asked of defendant by the prosecutor was intended to show that the fence had previously been cut and to support the State's theory of how defendant was able to enter the property without bolt cutters. The comments did not state that defendant had committed a prior burglary, nor was the word "burglary" ever used. Therefore, the prosecutor did not inform the jury of other burglaries or imply that defendant was guilty of other crimes.

Defendant further argues that the State proffered a prejudicial statement that a defense witness refused to testify and that the witness was fictitious.

In its closing argument the State asserted:

> "The fictitious Betty *** why, because that is all the defense can go to because even Wendy and the fictitious Betty who wouldn't come in and testify ***."

Defendant maintains that this comment created the presumption in the jury's mind that Betty did not exist, when the State had no evidence of that fact.

■ Where a defendant injects into the case the name of an alibi witness and then fails to call the witness, the State may legitimately comment on the lack of such evidence although it may not be relied upon as proof of the charge. *People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247.

Defendant finally assigns error to a comment made by the State during opening statement when the State asserted that Shawn Hobbs was the fourth defendant in this case. Defendant maintains that he denied that Shawn Hobbs was his nephew or brother, and that the fourth person in the automobile with him on the morning of the incident was a friend named Woody. He contends that the only evidence that the fourth person was named Shawn Hobbs came from Detective Dwyer and Officer Soukup. Defendant argues that the lack of evidence in the record that Shawn Hobbs was related to him, and that the State's questioning of him, implied to the jury that he had brought a juvenile into a criminal activity.

■ Where argument is based on facts in evidence, and inferences which may be drawn therefrom, argument is proper. (*People v. Pryor* (1988), 170 Ill. App. 3d 262, 524 N.E.2d 700.) Here, Detective Dwyer and Officer Soukup testified that the younger person arrested at the scene was named Shawn Hobbs. Although defendant Michael Hobbs stated that the person accompanying him was named "Woody," throughout his testimony Hobbs referred to the person as Shawn Hobbs. While there was no express evidence that Michael and Shawn

were related, under the circumstances it was reasonable to infer that they were. Shawn accompanied Michael from the party at Michael's home to the location of the van and spent about two hours with him. We find that a reasonable inference to be drawn from the evidence was that Michael and Shawn Hobbs were related.

However, even if the prosecutor's comments were improper, absent deliberate misconduct on the part of the prosecutor, the error was not grounds for reversal unless it resulted in substantial prejudice to defendant. (*People v. Kelly* (1985), 134 Ill. App. 3d 732, 480 N.E.2d 1343.) We cannot say that the prosecutor's identification of Shawn Hobbs as a relative of Michael Hobbs resulted in substantial prejudice to defendant.

Defendant also argues that he is entitled to a new trial because the prosecutor misstated the law and made arguments contrary to the evidence. Specifically, he asserts that during closing argument the State, in referring to Michael Hobbs, advised the jury that "if the name is Hobbs, then you can presume there's a relation." Defendant cites to *People v. Lawler* (1990), 194 Ill. App. 3d 547, 551 N.E.2d 799, in support of his argument.

In *Lawler*, the defendant was charged with aggravated criminal sexual assault. The prosecutor asserted that because of defendant's prior conviction, " 'then the law presumes that he is willing to lie.' " (194 Ill. App. 3d at 559.) The court reversed the conviction because the prosecutor's statement clearly misstated the law, and the court was not able to determine what effect the prejudicial statement had on defendant's conviction.

■ *Lawler* is distinguishable from the instant case. Here, the statement by the prosecutor simply identified Shawn Hobbs as a relative and accomplice of Michael Hobbs, a reasonable inference that could be drawn from the evidence. The prosecutor's comments were not blatant misstatements of the law such as those in *Lawler*, nor can we say that the statement was a factor in defendant's conviction for burglary.

Defendant finally argues that the trial court made incorrect rulings which denied him a fair trial. Specifically, he points to the court's failure to allow defendant to question the State's witness regarding the absence of a confession.

■ In reviewing the record in this case, it is clear that defense counsel attempted to elicit testimony from Officer Soukup that he did not obtain a confession from defendant. However, defendant did not, either at trial or in his post-trial motion, raise any issue related to the trial court's restriction of cross-examination. Failure to raise the issue

of improper restriction of cross-examination in defendant's post-trial motion constitutes waiver. (*People v. Graves* (1986), 142 Ill. App. 3d 885, 492 N.E.2d 517.) Further, defendant offers no authority for the proposition that the failure of the State to obtain a confession is proper impeachment. Thus, we must conclude that even if the question was improper, defendant's failure to raise a timely objection constitutes waiver.

Defendant also maintains that the trial court erred in allowing Officer Rogers to testify to information contained in reports prepared by other officers. In determining whether an accused has been prejudiced by the admission of evidence that was improper, so as to require a reversal of the judgment, a reviewing court will look to the entire record to see if the admitted evidence could have reasonably affected the verdict. (*People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 452 N.E.2d 32.) Where a different result would not have occurred in the absence of the admitted evidence, a reviewing court will not disturb the judgment. *People v. Graves* (1986), 142 Ill. App. 3d 885, 492 N.E.2d 517.

■ Here, Officer Soukup gave credible testimony of how he observed defendant and two others through binoculars remove items from the trailer, carry the items through a hole in the fence, stack them and walk back to the van. Officer Soukup also identified defendant in court. Officer Krull testified that, when he arrived, defendant Hobbs was in custody and that Officer Soukup advised him that defendant was being held for burglary. In light of this evidence, any error that might have resulted by Officer Rogers' testimony to the information contained in the police reports was harmless error.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.