THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LIVELL FIGGS, Defendant-Appellant.

First District (6th Division)   No. 1—93—4468

Opinion filed August 11, 1995.

736

Rita A. Fry, Public Defender, of Chicago (Greg Koster, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Navarre, and Kathleen Kelly Schnieders, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A grand jury indicted the defendant, Livell Figgs, and his codefendant, Jesse Hamilton, for first degree murder for the August 5, 1990, fatal shooting of Carlos Palton. The defendant filed a motion for severance, and he and Hamilton were tried simultaneously before two separate juries. The defendant's jury found him guilty, and the judge sentenced the defendant to 40 years' imprisonment. The defendant contends that the State denied him a fair trial by discriminating in its use of peremptory challenges to potential jurors, by asking improper questions of a witness and by engaging in inappropriate closing argument.

The State based its case primarily on the testimony of a witness to the shooting, Brenda Diane Seals. Seals testified that, in August 1990, she lived around 55th and Marshfield, where she had lived for 23 years. She had known Palton and his family for most of her life. She had known the defendant, also known as Morocco, for four or five years and had known Hamilton, also known as Tojo, for seven or eight years. She had seen the defendant and Hamilton every day selling drugs on the corner of 56th and Ashland.

On August 5, 1990, she left her home a little after 1 a.m. to go to Fatty Pigs restaurant at 55th and Ashland. Palton was at the restaurant with Wesley Dyer and some other friends. After eating at Fatty Pigs, Seals went to a liquor store at 56th and Ashland. Palton followed her. The defendant, Hamilton and some of their "associates," Pete, Donnie and Ray Ray, were talking in front of a lounge two doors from the liquor store.

Seals and two men, named Turtle and James, bought some wine in the liquor store, and Seals bought some beer for Palton. She, Turtle and James walked to the southwest corner of 56th and Marshfield. As she stood on this corner, she saw Palton and Dyer walking toward her on the south side of the street. The defendant, Hamilton, Pete, Donnie, Ray Ray and someone named Otis were following Palton and Dyer. Near the corner of 56th and Marshfield, they formed a circle around Palton, and Dyer ran from them. The defendant and Hamilton began slapping Palton in the face, and Hamilton accused Palton of selling drugs on their turf.

Hamilton told the defendant to go get "the missile," by which he meant a gun. The defendant ran into a gangway and returned with a gun, which he gave to Hamilton. Hamilton gave the gun back to the defendant and said, "[S]hoot him." The defendant fired the gun twice at Palton's back and gave the gun to Hamilton, who fired once or twice at Palton.

The defendant, Hamilton and their "associates" ran from the

scene. Seals ran to Palton's house nearby and told Palton's mother, Mary Palton, "that her baby had just got shot." She then returned to 56th and Marshfield, but she did not talk to the police because she was scared of the defendant and Hamilton. Later that morning, however, she talked to the police and told them that she had witnessed the shooting. On August 5, 1990, she identified Hamilton as one of Palton's shooters from a photograph the police showed her. She looked through books of photographs for a picture of the defendant but did not find one. On January 16, 1991, however, she identified the defendant in a lineup.

As impeachment, the defendant presented Seals' testimony before the grand jury in this case and her testimony from Figgs' first trial, which had resulted in a hung jury. Although she testified at the second trial that she had not had anything to drink before witnessing the shooting, she testified before the grand jury that she had drunk three sips of wine before the shooting. Also contrary to her testimony at the second trial, she testified at the first trial that, after the defendant ran from the gangway with the gun, he pointed the gun at Palton and fired. During the first trial, she also admitted telling the police that she was sitting in a doorway at 1639 West 56th at the time of the shooting rather than standing on the corner.

Mary Palton was the State's first witness. She explained that her son was 18 years old at the time of the shooting. She testified that Seals had come to her door after 1 a.m. on August 5, but the defendant's counsel objected to the State's questions concerning the contents of her conversation with Seals.

The State also presented the testimony of several police officers and a medical examiner. These officers explained that they arrived at 56th and Marshfield at approximately 1:30 a.m. on August 5, 1990, and found Palton lying on his back at the southeast corner of that intersection. At 1623 West 56th, the police found one spent .9 millimeter cartridge from a semiautomatic gun. Palton was taken to Cook County hospital, where he died later that morning. The medical examiner testified that Palton died from multiple gunshot wounds. One gunshot entered the back of his left thigh and exited through the front. The other entered his lower back and exited through his chest. He also had abrasions to his face, which the medical examiner opined were the result of being struck in the face within the hour before his death.

In September 1990, the police obtained a warrant for the defendant's arrest. In January 1991, they arrested him at his father's home, where they found him hiding in a pile of clothes.

The defendant did not testify, but the defense recalled one of the

police officers, Detective James Brennan, to testify in his case. Brennan testified that Seals had told him that the defendant and Hamilton had shot Palton with a semiautomatic gun, but she had not told them that the gun was a .9 millimeter. She had also told them that the defendant had fired one shot and Hamilton had fired three or four shots. In addition, she had told the police that she had been sitting in a doorway at 1639 West 56th at the time of the shooting and stood up as the shooting occurred.

The defendant first contends, under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, that the State violated his right to equal protection under the fourteenth amendment to the United States Constitution by using peremptory challenges to exclude potential jurors solely on the basis of race. In *Batson*, the Court established a three-step analysis for determining whether the State engaged in this form of purposeful discrimination. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24.

To show a *Batson* violation, the defendant must first establish a *prima facie* case of discrimination in the State's use of peremptory challenges through relevant circumstances that raise a reasonable inference that the prosecutor used peremptory challenges to exclude potential jurors on the basis of race. (*People v. Hudson* (1993), 157 Ill. 2d 401, 626 N.E.2d 161.) These relevant circumstances include:

> "(1) a pattern of strikes against black venirepersons; (2) a disproportionate use of peremptory strikes against black venirepersons; (3) the level of black representation in the venire as compared to the jury; (4) the prosecutor's questions and statements during *voir dire* and while exercising peremptory challenges; (5) whether the excluded black venirepersons were a heterogeneous group sharing race as their only common characteristic; and (6) the race of the defendant, victim and witnesses." (*Hudson*, 157 Ill. 2d at 426.)

A defendant cannot establish a *prima facie* case based merely on the number of black venirepersons excluded. (*People v. Peeples* (1993), 155 Ill. 2d 422, 616 N.E.2d 294.) A judge's determination that the defendant did not show a *prima facie* case of discrimination is a finding of fact, and a reviewing court will not overturn such a finding unless it is against the manifest weight of the evidence. *Peeples*, 155 Ill. 2d at 469.

After the judge has determined that the defendant has established a *prima facie* case, the burden of production shifts to the State to present race-neutral explanations for striking a potential juror. (*People v. Mitchell* (1992), 152 Ill. 2d 274, 604 N.E.2d 877.) "The second step of this process does not demand an explanation that is

persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem* (1995), 514 U.S. 765, 767-68, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771, quoting *Hernandez v. New York* (1991), 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406, 111 S. Ct. 1859, 1866.

Once the State offers a race-neutral reason for its exclusion of a potential juror, the judge must decide whether the defendant has proved that the State engaged in purposeful discrimination. (*People v. Kitchen* (1994), 159 Ill. 2d 1, 636 N.E.2d 433.) This is largely a determination of credibility by the trial judge to which reviewing courts must give great deference. (*Kitchen*, 159 Ill. 2d at 19.) Trial judges " 'are familiar with local conditions and prosecutors, and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one.' " (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 415, 539 N.E.2d 1172, quoting *People v. Evans* (1988), 125 Ill. 2d 50, 67, 530 N.E.2d 1360.) A reviewing court will not, therefore, overturn a trial judge's finding as to whether the State engaged in purposeful discrimination unless it is clearly erroneous. *Kitchen*, 159 Ill. 2d at 19.

Before *voir dire*, the parties submitted questions to the judge. After the judge questioned each of the two panels of jurors, he asked the parties if they had any additional questions for the jurors. Neither party had additional questions.

After the judge questioned both panels of jurors, the State used two of its peremptory challenges to excuse Araina Brown and Anne Williams. The defendant's counsel objected on *Batson* grounds because both of these jurors were black females. The judge stated that he thought this challenge was premature. He noted that the parties had selected the jury for Hamilton only a few hours earlier, and this jury included three or four black jurors. Nevertheless, the judge found that the defendant had shown a *prima facie* case of racial discrimination, and he asked the State to provide race-neutral reasons for its challenges. After a hearing in which the State provided explanations for its challenges, the judge found that there had been no *Batson* violation.

The jury selection then continued. As the judge explained for the record, the next juror was a black female, Angela Underwood, whom the State accepted. Several jurors later, the State challenged another black female juror, Elizabeth Boykin, and then a white female juror, Sister Margaret Martinique. After the State then accepted a black male juror, Homer Walker, it used its fifth challenge to excuse an-

other black female, Nina Bonds. The State used only five of its peremptory challenges.

The defense objected to the challenges against Boykin and Bonds before the judge swore in the jury the next day. The judge decided, however, that the defense had not established a *prima facie* case of racial discrimination:

> "There are apparently two African Americans on the jury. At this time based on the exclusions made by the State the Court finds there is not a *prima facie* showing of *Batson* violation at this point.
>
> There was earlier on the first two people who were challenged, the State gave race neutral reasons. At this time the Court finds that there is not a *prima facie* showing of a *Batson* violation."

Using the *Batson* framework, we first address the defendant's claim that the judge erred in finding that the State had not engaged in purposeful discrimination by excluding two black female jurors, Araina Brown and Anne Williams. As soon as the State has presented race-neutral reasons for its challenges, and the judge has ruled on the ultimate question of discrimination, the issue of whether the defendant established a *prima facie* case becomes moot. (*Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.) We need only determine, therefore, whether the judge's determination that there was no discrimination in the challenges to Brown and Williams was clearly erroneous.

During the *Batson* hearing, the State explained that it had challenged Araina Brown because she was studying social work and therefore "tend[ed] to lean more to the liberal side and tend[ed] to sympathize more with the defendant than she would with the victim." The State offered to provide other reasons, but the judge stated that he was satisfied with the reason the State had provided him.

■ The judge's acceptance of the State's explanation for challenging Brown is supported by several cases in which courts have held that the prosecutor's belief that a potential juror has liberal views because of her involvement in the social work field is a legitimate race-neutral reason for excluding that juror. See, *e.g.*, *Mitchell*, 152 Ill. 2d at 298-99; *People v. Hemphill* (1992), 230 Ill. App. 3d 453, 594 N.E.2d 1279.

The State asserted several bases for challenging Anne Williams. She had stated during *voir dire* that she was retired from the Chicago police department, but, when the court asked the jurors whether they had any friends who were police officers, she did not raise her hand. Also, although she said she was retired, she did not "look of an

age that would be retired." Furthermore, although she did not respond affirmatively to the judge's question whether any of the jurors had been arrested before, the State had a Chicago police department "B of I" that indicated "a person around her date of birth was arrested before."

Although the defense counsel objected to the State's use of the arrest record because it was not certain that Anne Williams was the person arrested, the judge stated that he accepted the State's three reasons for excluding her as race-neutral. He stated that the "most logical" reason was that she had worked at the police department but had no police officers as friends, which could indicate that she left the department on poor terms. Again, we think that the judge properly concluded that the State had presented race-neutral reasons for excluding Williams. We need not address whether the "B of I" was a legitimate basis for exclusion because we conclude that the other reasons the State offered were legitimate race-neutral reasons for excluding her. See *Mitchell*, 152 Ill. 2d at 302-03 (although the basis for one of the prosecution's explanations was erroneous, the other legitimate explanations for the challenge supported the judge's conclusion that there was no *Batson* violation).

As the judge stated, the facts that Williams looked too young to be retired and had no friends who were police officers may have suggested that she left the police department on poor terms. Courts have found that a juror's potential bias against police officers is a legitimate race-neutral reason. See *People v. Banks* (1993), 243 Ill. App. 3d 525, 611 N.E.2d 1270; *People v. Woods* (1989), 184 Ill. App. 3d 688, 540 N.E.2d 1020.

After accepting the State's reasons, the judge concluded that the defendant had failed to show a *Batson* violation at that time. The defendant contends that the judge erred in failing to find discrimination because the State's reasons for excluding Brown and Williams were pretextual.

With respect to Brown, the defendant argues that it was pretextual to exclude her on the basis of a class-based stereotype without examining her to determine whether she actually possessed the stereotypical liberal views of social workers. The defendant makes a similar argument with respect to Williams. He argues that the facts that she did not have friends who were police officers and looked too young to be retired do not necessarily indicate that she left the police department on poor terms and that the prosecutor or the judge should have examined her to determine whether this was true.

The defendant relies on *People v. Cannon* (1992), 227 Ill. App. 3d 551, 592 N.E.2d 168, to support his arguments concerning Brown and

Williams. *Cannon* does not require us to reverse the judge's finding that there was no *Batson* violation. Contrary to the defendant's argument, the *Cannon* court did not hold that a class-based stereotype could never be a legitimate race-neutral reason. Rather, the *Cannon* court held that a class-based stereotype was not a legitimate race-neutral reason *in the case before it* because the excluded juror was not a member of the class. *Cannon*, 227 Ill. App. 3d at 558.

The *Cannon* holding also does not support the defendant's argument that a prosecutor must examine an excluded juror to determine whether the juror actually possesses the trait on which he bases the challenge. The *Cannon* court did not hold that, by failing to examine an excluded juror about her "strong religious background," the prosecution had failed to show the truth of this explanation; the court held that the prosecution had failed to show that this reason was trial specific. See *Cannon*, 227 Ill. App. 3d at 556.

In contrast to the juror who was excluded because of a class-based stereotype in *Cannon*, there was no evidence in the case before us that Brown did not possess the stereotypical liberal views of social workers. The record indicates that she was a student of social work, and the prosecutor stated that he thought she had liberal views. Also, unlike *Cannon*, no further inquiry was necessary to show that the prosecutor's explanations for excluding Brown and Williams were trial specific. He stated that he believed Brown's liberal views would tend to make her more sympathetic toward the defendant. Williams' relationship with the police department was relevant to the defendant's trial because many of the State's witnesses would be police officers.

It is clear from other cases that a prosecutor is not obligated to examine a juror to verify his assumptions that a group possesses certain traits and that a juror who is a member of that group possesses those traits. (See, *e.g., People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357 (accepting as race-neutral the State's explanation that a juror lived in Hyde Park, whose residents were more open to new ideas than other Chicagoans).) As the court stated in *People v. Thomas* (1990), 201 Ill. App. 3d 255, 260, 559 N.E.2d 262:

> "[T]he prosecutor's belief does not need to be proved demonstrably true either in general or in regard to the particular [juror] excluded. These are merely two important factors that the trial judge should consider in evaluating the legitimacy of the State's explanation. (*Harris*, 129 Ill. 2d at 177-78.) The touchstone again is whether the prosecutor's opinion about the group to which the [juror] belongs, correct or not, actually motivated the peremptory challenge or whether it was merely pretextual."

In addition to the reasons the State gave for striking Williams and Brown, other circumstances of the jury selection process support the judge's finding that there was no purposeful discrimination. Two black venirepersons did serve on the jury, the State did not strike the four black venirepersons consecutively, the State accepted black venirepersons between its strikes against black venirepersons and the prosecutor had peremptory challenges remaining but did not use them to strike black venirepersons. See *Mitchell*, 152 Ill. 2d at 304; *People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 586 N.E.2d 292; *People v. Johnson* (1991), 218 Ill. App. 3d 967, 980, 578 N.E.2d 1274, quoting *People v. Hooper* (1989), 133 Ill. 2d 469, 552 N.E.2d 684.

The trial judge was in a superior position to determine the credibility of the prosecutor, and he decided that the prosecutor's stated explanations for striking Araina Brown and Anne Williams were the motivations for the prosecutor's challenges. We cannot say that the judge's decision that there was no racial discrimination was clearly erroneous.

■ We next address the defendant's assertion that the judge erred in failing to find a *prima facie* case of discrimination after the State used two of its three remaining peremptory challenges to exclude two additional black females. As a preliminary matter, we disagree with the defendant's assertion that, in reviewing the judge's decision that there was no *prima facie* case of racial discrimination, we must consider the State's strikes against Williams and Brown. As we have stated, after the State has presented race-neutral reasons for its challenges, and the judge has ruled on the ultimate question of discrimination, the issue of whether the defendant established a *prima facie* case is moot. (*Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.) The question of a *prima facie* case as to Brown and Williams was, therefore, moot; the judge had already decided that the challenges against them were not discriminatory.

In a case with similar facts, *People v. Caine* (1994), 258 Ill. App. 3d 599, 630 N.E.2d 1037, the court upheld the trial judge's determination that there was no *prima facie* showing of discrimination. In *Caine*, the defendant made a *Batson* objection after the State used its first three peremptory challenges against black venirepersons. The judge decided that there was a *prima facie* case of racial discrimination, but he found no *Batson* violation after a hearing. After the judge's ruling, jury selection continued. The defense made another *Batson* objection, but, based on the fact that the State had used its remaining six challenges to exclude three whites and three blacks, the judge found that there was no *prima facie* case of discrimination. *Caine*, 258 Ill. App. 3d at 605.

Like the judge in *Caine*, the judge's comments in this case indicate that he may have considered only the challenges after the *Batson* hearing in determining whether the defendant had established a *prima facie* case of racial discrimination. Under *Caine* and *Hernandez*, we will consider only the State's challenges after the *Batson* hearing in determining whether the judge properly found that there was no *prima facie* case of racial discrimination.

■ The relevant circumstances of this case support the judge's conclusion that there was no *prima facie* case of discrimination. We do not think that the State's use of two out of its three challenges against black venirepersons establishes a pattern of strikes or a disproportionate use of strikes against black venirepersons, and, therefore, we will consider these as neutral factors. (See *People v. Brisbon* (1989), 129 Ill. 2d 200, 544 N.E.2d 297.) Even if we were to conclude otherwise, these factors alone are insufficient to establish a *prima facie* case. *People v. Hayes* (1993), 244 Ill. App. 3d 511, 614 N.E.2d 229.

The level of black representation in the venire as compared to the jury is also a neutral factor in this case because there is no evidence in the record that indicates the racial composition of the venire. The prosecutor's questions and comments during *voir dire* are an additional neutral factor. The prosecutor neither submitted nor asked questions during the *voir dire* in this case, and the defendant does not argue that the prosecutor's comments during *voir dire* showed a racial bias.

The fact that the defendant, victim, and star prosecution witness were all the same race, black, is a factor in the State's favor because it suggests that the prosecutor's challenges were not motivated by discrimination. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234.) Although it is unclear from the record what races many of the State's witnesses were, it is significant that the only evidence that the defendant shot Palton was from Seals, who was of the same race as the defendant. See *Henderson*, 142 Ill. 2d at 289.

We will consider the heterogeneity of the excluded jurors, Boykin and Bonds, as a factor in favor of the defendant because there is no evidence in the record that Bonds and Boykin had any characteristics in common other than their race, gender and the fact they both lived in Chicago. Boykin was a retired administrative assistant for the Illinois Department of Public Aid. She was married to a retired professor of statistics and education at Southern Illinois University. There is no indication in the record that she had children. Bonds was a single mother of one and worked as a cashier at Woolworth's.

The defendant argues that there was a *prima facie* case of

discrimination because the State accepted jurors with characteristics similar to Bonds and Boykin. If excluded jurors share a characteristic other than race, a defendant may show that they are nevertheless heterogeneous by showing that accepted jurors also share this characteristic (*People v. Andrews* (1992), 146 Ill. 2d 413, 588 N.E.2d 1126), but it is not necessary in this case for us to make such a comparison because we do not find that Bonds and Boykin share any characteristics that would be a basis for excluding them.

After examining the factors in this case, we find that the judge's conclusion that there was no *prima facie* case of racial discrimination was not against the manifest weight of the evidence. Only one of the factors that establish a *prima facie* case of racial discrimination, the heterogeneity of the excluded jurors, was in the defendant's favor. The race of the defendant, the victim and the witnesses was a factor in the State's favor, and the remaining factors were neutral.

The defendant's final argument concerning the State's use of peremptory challenges is that we must remand his case for the State to present gender-neutral reasons for striking five female venirepersons. He claims that there was a *prima facie* case of gender discrimination based on the State's use of five of its five peremptory challenges to strike female venirepersons, Williams, Brown, Boykin, Bonds and Sister Martinique. He asserts that these excluded venirepersons were a heterogeneous group, whose gender was the only characteristic they shared and the only characteristic that distinguished them from accepted jurors. The selected jury included six male and six female jurors, plus two male alternates. Before trial, one of the male alternates replaced one of the female jurors.

The defendant did not object at trial or in his post-trial motion to the challenge against Sister Martinique. He also did not object in the trial court to any of the challenges on the basis of gender discrimination. His case was tried, however, before the United States Supreme Court held in *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419, that the equal protection clause prohibits gender discrimination in jury selection.

The State asserts that the defendant waived this issue for review by failing to raise it in the trial court. The defendant argues that we should review his claim as plain error. He relies on *People v. Lann* (1994), 261 Ill. App. 3d 456, 633 N.E.2d 938, in which, based on the plain error doctrine, the court remanded the defendant's case for him to establish a *prima facie* case of gender discrimination.

After the *Lann* decision, the Illinois Supreme Court held that *J.E.B.* applies to cases that were pending on appeal when the United States Supreme Court decided *J.E.B.* (*People v. Blackwell* (1995), 164

Ill. 2d 67, 646 N.E.2d 610.) In *Blackwell*, as here, the defendant's case was pending on appeal when the Court decided *J.E.B.*, and the defendant did not raise the issue of gender discrimination in the trial court. The *Blackwell* court stated, however, that discrimination during the jury selection process could constitute plain error. Unlike the *Lann* court, the court in *Blackwell* did not remand for the defendant to establish a *prima facie* case of discrimination, but it reviewed the record to determine whether the alleged error constituted plain error. *Blackwell*, 164 Ill. 2d at 74-75.

Based on its finding that the record showed a *prima facie* case of gender discrimination, the supreme court found plain error and remanded the case for the State to present gender-neutral reasons for its challenges. The court decided that the following "relevant circumstances" established a *prima facie* case. First, the fact that the State had used 15 of 17 strikes to exclude women established a pattern of strikes. Second, the court considered the prosecutor's comments at the *Batson* hearing in the case. The prosecutor had stated that he used peremptory strikes against 15 females, and he commented twice that jurors might sympathize with the defendant's mother, who was to testify in the case. (*Blackwell*, 164 Ill. 2d at 76.) The court found that these circumstances demonstrated a *prima facie* case of gender discrimination and, therefore, plain error:

> "The prosecutor then stated that he had used 15 peremptory challenges against females and that he was concerned that jurors might feel sympathy for defendant's mother. In the context of a *Batson* hearing, the logical inference is that the prosecutor was excusing prospective jurors on the basis of gender, not race. Under the facts of this case, after considering the State's pattern of strikes and the statements of the prosecutor, we conclude that the record establishes a *prima facie* case of gender discrimination. Under the circumstances of this case, we find plain error." (*Blackwell*, 164 Ill. 2d at 76.)

It is clear to us that the overriding factor in *Blackwell* was the prosecutor's admission that gender was, in fact, the basis of his exercise of 15 challenges against women jurors. No such factor is present in this case.

■ We judge that, unlike the record in *Blackwell*, the record in this case does not establish a *prima facie* case of gender discrimination. Although the State did not present gender-neutral reasons at trial for excluding any of the venirepersons, its race-neutral explanations for excluding Brown and Williams indicate a lack of gender discrimination in the challenges against them. (See *People v. Anderson* (1994), 266 Ill. App. 3d 947, 641 N.E.2d 591 (as corrected

October 17, 1994).) Even including the strikes against Brown and Williams, we do not believe the defendant has shown a *prima facie* case of gender discrimination.

The State used all five of its challenges to exclude women. Nevertheless, a pattern of strikes is not dispositive of a claim of a *prima facie* case of discrimination. (*Blackwell*, 164 Ill. 2d at 75.) Furthermore, it is not clear from the prosecutor's comments, as it was in *Blackwell*, that the prosecutor in this case used his challenges to intentionally strike women from the venire. The prosecutor made no comments in striking Boykin, Bonds and Martinique; he did not respond to the defense's *Batson* objection; and his comments at the *Batson* hearing for Brown and Williams do not indicate a gender bias.

Although the defendant argues that the excluded jurors were a heterogeneous group with nothing other than their gender in common, we believe that there were similarities within this group. Four of the five excluded women, Araina Brown, Anne Williams, Nina Bonds and Sister Margaret Martinique, were not married, but only 2 of the 14 accepted jurors, Harold Zeiden and Catherine McIntyre, were single. Three of the five excluded women had occupations that suggested involvement in social service. Araina Brown was a student in social work, Elizabeth Boykin was a retired administrative assistant for the Illinois Department of Public Aid and Sister Margaret Martinique was a nun and a teacher. In contrast, the only accepted juror who had a similar job was Gina Kabelis-Misiunas, who was a junior high school health teacher. Although one or two accepted jurors shared characteristics that excluded jurors shared, this does not require us to find that the excluded jurors were heterogeneous. We believe that the case before us differs from cases in which courts have found excluded venirepersons heterogeneous on the basis that accepted jurors also possessed the characteristics that the excluded venirepersons shared. In those cases the excluded venirepersons shared characteristics with several, not just one or two, accepted jurors. (See, *e.g., Andrews*, 146 Ill. 2d at 432-33 (although five of the eight excluded black venirepersons had contact with the legal system, 6 of the 12 accepted jurors also had such contact).) Under these circumstances, we will not review the alleged error under the plain error doctrine because the defendant has failed to establish a *prima facie* case of gender discrimination.

The defendant's remaining assertions of error concern matters during the trial. He claims that questions the prosecutor asked Detective Brennan when he was testifying in the defendant's case were improper. He argues that these questions, in which the prosecutor attempted to elicit prior consistent statements by Seals, were improper

because they pertained to matters about which Seals had not been impeached and because the prosecutor persisted in asking these questions despite sustained objections and an admonishment by the court.

The State first asked Detective Brennan if Seals had told him what the defendant and Hamilton did when they first approached Palton. The defendant's counsel objected and the State asked for a sidebar. At the sidebar, the defendant's counsel argued that prior consistent statements are admissible only if they relate to "specific points elicited," and the judge sustained the objection. The State's cross-examination then continued as follows:

> "[Assistant State's Attorney]: Detective Brennan, when Diane Seals told you about what happened at the time that she saw Carlos Palton killed she told you that Tojo and Morocco initially were slapping Carlos Palton in the face, didn't she?"
>
> [Defense Counsel]: Objection.
>
> THE COURT: Sustained.
>
> [Assistant State's Attorney]: Well, Detective Brennan, what did Diane Seals tell you during your conversation with her?
>
> [Defense Counsel]: Objection.
>
> THE COURT: Sustained.
>
> [Assistant State's Attorney]: Did Diane Seals give you the name of any other people that shot Carlos Palton other than Morocco or Tojo?
>
> [Defense Counsel]: Objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: No.
>
> [Assistant State's Attorney]: Did Diane Seals tell you what Tojo and Morocco did before they shot Carlos Palton?
>
> [Defense Counsel]: Objection.
>
> THE COURT: Sustained.
>
> [Assistant State's Attorney]: Detective Brennan, you related in your report that during the altercation a man known to her as Tojo began to strike the victim in the face—
>
> [Defense Counsel]: Objection.
>
> THE COURT: Sustained.
>
> [Assistant State's Attorney]: Then another—
>
> THE COURT: Sustained.
>
> [Defense Counsel]: Judge.
>
> THE COURT: Counsel, hold on, the objection is sustained please go to another line of questioning.
>
> [Defense Counsel]: Thank you.
>
> [Assistant State's Attorney]: Did Diane Seals during your conversation with her tell about a missile?
>
> A. Yes.

Q. And specifically, did Diane Seals tell you that Tojo told Morocco to get the missile?

[Defense Counsel]: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

[Assistant State's Attorney]: Did Diane Seals tell you that Morocco then went through the south gangway of a corner at the building at 5601 South Marshfield, he entered east—

THE COURT: Objection sustained.

[Defense Counsel]: Thank you.

THE COURT: Counsel, please limit your questions to the area that counsel questioned. All right, she impeached on certain specific items please maintain yourself to those items.

[Assistant State's Attorney]: When Diane Seals told you that Tojo told Morocco to get the missile what did she tell you that Morocco did?

THE COURT: Okay, please have a seat. Anything else?

[Assistant State's Attorney]: No."

The defendant cites two cases, *People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924, and *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432, in support of his argument that the prosecutor's questioning denied him of a fair trial, but we think the facts of those cases are distinguishable from those in the case before us. In those cases, the courts decided that the prosecutor's misconduct had deprived the defendant of a fair trial. In *Weinger*, however, the defendant had alleged 35 instances of prosecutorial misconduct. The court's holding was based on the cumulative impact of the error, which included 20 instances in which the prosecutor persisted in asking questions to which the trial court had sustained objections. (*Weinger*, 101 Ill. App. 3d at 866, 871.) Similarly, in *Weinstein*, the court's holding was based on the prosecutor's continued improper argument despite 17 sustained objections. *Weinstein* differs further from the defendant's case in that the basis for reversal was argument, not questioning, by the prosecutor. *Weinstein*, 35 Ill. 2d at 469, 470.

■ In the context of the entire record before us, the prosecutor's questions seem to be ineffective attempts to phrase a question within the bounds of the court's ruling rather than an intentional disregard of this ruling. The fact that objections to some of his questions were overruled may explain his continued efforts to question Detective Brennan concerning what Seals had told him. Furthermore, a timely objection and appropriate admonition by the court is generally sufficient to prevent error or to render any error harmless. (See, *e.g.*, *People v. Moody* (1990), 199 Ill. App. 3d 455, 557 N.E.2d 335.) In this case, the defense promptly objected to the questions the defendant

now deems prejudicial, and the judge commendably exerted control by his own action in restricting and terminating the cross-examination. In addition, the judge later instructed the jury to disregard questions to which he had sustained objections. We find no reversible error in the State's cross-examination of Brennan.

The defendant's final assertion of error is that he was denied a fair trial by comments that the State made during its rebuttal closing argument. The State contends that its comments were invited by the defendant's argument. During the defendant's closing argument, his counsel attacked Seals' credibility based on the lack of evidence that she told anyone immediately after the shooting that the defendant and Hamilton had shot Palton:

"You'll notice that on the scene obviously she doesn't talk to the cops so she doesn't go up and say Tojo and Morocco killed Carlos but also when she has an opportunity to first tell somebody her story she tells Mary Palton your child had just been shot, your baby has been shot. Is there any testimony that she told Mary Palton Carlos has been shot, those drug dealers on the corner Tojo and Morocco shot him? Nothing.

The first time any names are mentioned at all, the first time it's mentioned that she actually saw the shooting she doesn't even tell Mary Palton [who] she saw, she says Carlos has been shot. The first time she says she saw it or names is five hours later."

The portion of the State's rebuttal argument about which the defendant complains is this:

"They attack Diane Seals' credibility saying that when she spoke to Mary Palton, when she ran over to the Palton residence on the morning right after she saw the shooting occur she didn't tell Mary Palton who she saw kill her son Carlos. But yet when Mary Palton was on the witness stand and she was asked at that time Ms. Palton when Diane Seals came to the door and when you answered the door what did she say? Objection sustained.

[Defense Counsel]: Judge we are going to object to that, this is improper argument.

THE COURT: Okay, ladies and gentlemen, that was not admissible evidence. You have heard the evidence. You are not to guess or surmise why certain evidence was not admissible if it was not admissible. You heard the evidence please consider that."

In his post-trial motion, the defendant asserted that the State denied him a fair trial when it "referred in closing argument to the fact that the defense made objections to certain testimony attempted to be elected [sic] by the State."

■ The State contends that the defendant has waived this issue for review by failing to specify the objectionable portions of the clos-

ing argument in his post-trial motion. Waiver aside, we do not think the prosecutor's remark warrants reversal. Courts give prosecutors a great deal of latitude in closing argument and will uphold a trial court's decision concerning the propriety of this argument absent a clear abuse of discretion. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970.) Courts examine a prosecutor's comments in their entirety and in the context of the arguments of both parties. *Cisewski*, 118 Ill. 2d at 176.

The defendant correctly argues that it is improper for a prosecutor to remark that, because of the defendant's objections, the jury was prevented from hearing relevant evidence. (See *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41.) However, a defendant may not claim as error rebuttal comments that were invited by his counsel's argument. *People v. Almendarez* (1994), 266 Ill. App. 3d 639, 639 N.E.2d 619.

We agree with the State's assertion that the prosecutor's comments were invited by the defense counsel's argument. The defense counsel prevented Mary Palton from testifying about the contents of her conversation with Seals. Seals also did not testify that she told Mary Palton the identity of the shooters, but she was not asked this question. Although the defense counsel did not object to Seals' testimony that she told Mary Palton that her "baby had just got shot," it was reasonable for the State not to inquire further about the contents of the conversation given the defendant's objection to Mary Palton's testimony about these contents and the judge's ruling on that objection.

After limiting the testimony about the contents of the conversation, the defense counsel argued to the jury that the lack of testimony that Seals had told Mary Palton who shot Carlos Palton showed that Seals had not in fact told her the identity of the shooters. There was no evidence as to whether Seals had told Mary Palton the identity of the shooters, yet the defense implied that she had not revealed their identity in her conversation with Mary Palton. It was, therefore, fair for the State to counter this implication by explaining that the State had objected to the introduction of the contents of the conversation.

Furthermore, the judge sustained a timely objection to the State's comment and instructed the jury that the State's argument was improper and that the contents of the conversation was inadmissible evidence they were not to consider. See, *e.g., People v. Berry* (1994), 264 Ill. App. 3d 773, 642 N.E.2d 1307.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.