THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRENCE GOLDEN, Defendant-Appellant.

First District (2nd Division)   No. 1—99—0586

Opinion filed June 29, 2001.

894

Rita A. Fry, Public Defender, of Chicago (Lester Finkle, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Annette Collins, and Nicole M. Wilkes, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:
Defendant Terrence Golden was convicted of first-degree murder and sentenced to a 40-year prison term. He argues on appeal that: (1) his confession should have been suppressed because it was not made knowingly and voluntarily; (2) he established a *prima facie* case of purposeful discrimination in the State's two final peremptory challenges; and (3) his sentence is excessive. We also consider an odd occurrence at the close of the trial. After an earlier finding that the defendant's statement about his involvement in the murder was voluntary, the trial court ordered defendant's signature on the statement redacted before it went to the jury. We affirm.

Defendant was charged with two counts of first-degree murder for the February 29, 1996, shooting of Ronald Samuel. Defendant filed a motion to suppress, alleging that his statements to police and the assistant State's Attorney were involuntary. At the hearing on the motion, Chicago police officer Robert Schaefer testified that, in the early afternoon of March 3, 1996, he and other officers went to defendant's home to investigate the murder. The officers told defendant's mother that they wanted to talk to defendant about a pending investigation. Defendant was not home, so the officers asked his mother to call them when he returned.

The officers arrested another suspect, Kevin Wright, a short time

later. Wright told the officers that defendant was across the street at that time. Schaefer approached defendant on foot and asked his name. Defendant said his name was Terrence Golden. The officer conducted a pat-down search, placed defendant in handcuffs and advised him of his *Miranda* rights. Defendant said that he understood his rights.

The officers and defendant arrived at the police station at about 3:20 p.m. Officer Schaefer discovered that defendant was 14 years old. Schaefer called defendant's home about 4 or 4:15 p.m. to inform defendant's parents that he was in custody but no one answered the telephone. Chicago police detective Edward Siwek testified that another detective, John Solecki, eventually spoke to defendant's brother-in-law, Ron Davis, and told him defendant was in custody.

Siwek further testified that he spoke to defendant at about 5 p.m. Solecki was present in the room and defendant was not handcuffed. Siwek advised defendant of his rights and defendant said he understood them. Their conversation lasted about 20 minutes.

Siwek testified that he did not speak to defendant's mother at the police station nor was he aware that she was at the station. He said he believed the police report showed that defendant's mother called the station about 6:45 p.m. Defendant never asked to speak to his mother and never indicated that he did not want to speak to detectives.

Assistant State's Attorney Lawrence O'Reilly testified that he spoke with defendant at about 6 p.m. on March 3, 1996. Schaefer and youth officer Daniel Grzyb were also present. Grzyb testified that his duty was to make sure defendant was advised of his rights and that defendant was not physically or psychologically coerced during questioning. The assistant State's Attorney advised defendant of his *Miranda* rights and that he could be tried as an adult. Defendant said he understood his rights and agreed to give a statement. O'Reilly interviewed defendant again a short time later about how the police had treated him while he was in custody. Defendant said he had been treated "nicely" and that everything was "fine."

O'Reilly further testified that at 8:50 p.m., in the presence of Schaefer, Grzyb and a court reporter, defendant gave a statement. O'Reilly again advised defendant of his constitutional rights. Defendant was not handcuffed. He gave a 27-page court-reported statement. Defendant reviewed the statement with O'Reilly, Schaefer and Grzyb, was given the opportunity to make corrections, and signed the statement. O'Reilly and Grzyb testified that defendant did not ask to see his mother and never said he did not want to speak to the officers or O'Reilly.

Defendant's mother, Jeanette Golden, testified that at least 10 police officers were in front of her house when she returned home from

the store on March 3, 1996. Detective Solecki told her he wanted to question defendant about a fight he had been in. Solecki said that one of the boys had been injured. Solecki gave Golden a business card and told her to have defendant call when he returned home. Golden testified that all the officers then left the house, but two remained in a parked car outside the house.

Golden further testified that, between 1:30 and 2 p.m., she went to Bellwood, Illinois, about 30 miles away. In Bellwood, Golden received a telephone call at about 7 p.m. from Ron Davis, who told her defendant had been arrested. But Golden also testified that she and her fiancé left Bellwood shortly after 6 p.m. and arrived at the police station between 6 and 7 p.m.

At the station, Golden spoke to Solecki, who told her that someone from the State's Attorney's office would be out to speak with her. Golden testified that she asked to speak to someone three more times before Solecki returned between 9:30 and 10 p.m. Solecki was surprised that no one had spoken to her yet and told her he would check again. Golden testified that she waited another two hours before the assistant State's Attorney came and told her defendant had been involved in a murder. Golden asked to see defendant.

An hour later, Golden saw defendant. He was seated in a chair and was not handcuffed. He was crying and his lip was bleeding and had a lump on it. Defendant told Golden that one of the officers had hit him in the mouth. Golden testified that she did not speak to the officers about defendant's injury.

Leon Cleveland, Golden's fiancé, testified that he and Golden arrived at the police station sometime after 6 p.m. He testified that Golden did not see defendant until 2:30 a.m.

Defendant testified that in the early afternoon of March 3, 1996, police officers stopped him, asked his name, and then put him and Kevin Wright into a squad car. The officers handcuffed him in the car. They slapped him repeatedly in the back of the head and verbally threatened him on the way to the station. Defendant testified that the squad car stopped suddenly and he hit his head on the front seat.

Defendant further testified that he was placed in a room by himself at the police station. He was handcuffed to a bench and repeatedly smacked on both sides of the face by Officer Schaefer and kicked in the shins by another officer. The officers told him what to say in his statement. Defendant testified that he was not advised of his constitutional rights when he was arrested or before either time he spoke to the assistant State's Attorney. Defendant said his picture was taken at the station and that he signed the back of the photo, which noted the time, date and location. He did not tell the judge at his bond

hearing that officers beat him and threatened him. After his arrest, defendant took courses in constitutional rights at the juvenile detention center.

Assistant Public Defender Amy Thompson testified that she was assigned to represent defendant and visited him in April 1996 to discuss his transfer hearing. Defendant told her that the police had hit him while he was in custody and told him what to say in his confession.

The parties stipulated to the testimony of Janine Bostick, a social worker for the State of Illinois Forensic Clinical Services. Bostick interviewed Jeanette Golden on October 31, 1996. Golden told Bostick that defendant was depressed after the deaths of his father, brother and cousin. Golden enrolled defendant in outpatient therapy at Michael Reese Hospital. Golden also told Bostick that, when he was in seventh grade, defendant was in special education classes. But at the time of his arrest, defendant attended regular ninth-grade classes at South Shore Academy High School.

The parties also stipulated to the testimony of Edward Blumstein, a psychologist for Forensic Clinical Services. Blumstein would testify that test results showed defendant had a full scale IQ of 79. Defendant had evenly developed cognitive functioning, except for his capacity to generate and formulate abstract concepts. Defendant's ability to use and understand relationships between abstract ideas is one of his relative strengths.

The results of a reading comprehension test showed that defendant tested in the fifth percentile in general vocabulary and the second percentile in overall reading comprehension.

The parties further stipulated to the testimony of Dr. Roni Seltzberg, an expert in forensic psychiatry. Dr. Seltzberg examined defendant and reviewed his records and test results. Dr. Seltzberg concluded that defendant "had the cognitive capacity to understand verbally presented *Miranda* Warnings, although it is unclear to me what a fourteen year old can appreciate of these warnings." At the time Dr. Seltzberg examined defendant, he was 16 years old and had been attending constitutional rights classes.

The trial court admitted defendant's court-reported statement and the photograph into evidence. The court noted that defendant's statement was not a "mere regurgitation of words proffered by the interrogator," but was "a conversation where the questioner asks questions and the responses are independent and thoughtful and relate facts independent of that of the questioner." The trial court also said that defendant's statement was "reflective on the intelligence of the defendant and his knowledge of the facility with the English language and his own sophistication."

An agent at the juvenile detention center testified that he examined defendant on March 5, 1996. The screening form showed that the agent marked "zero" in the areas of "illness; rashes and bugs; injuries and bites; hospitalization; impairment; mental status; medications."

The trial court found that defendant had not been physically or mentally coerced, and that he had been advised of and understood his rights. The court ruled that defendant's statement was made knowingly and voluntarily. But the court also found that the police were aware of Jeanette Golden's presence at the police station sometime after 7 p.m. The court ruled that the officers should have brought Golden to see defendant before or during his court-reported statement. The court suppressed evidence of the execution of the written statement, including testimony about defendant's review and signature of the statement. The written statement was copied and submitted to the jury at trial with the signatures redacted. Assistant State's Attorney O'Reilly testified to the contents of defendant's oral statement at trial.

At trial, Stephanie Stamps testified that on February 29, 1996, at about 3 p.m., she looked out her living room window and saw two males on the sidewalk in front of her house at 7704 South Colfax Avenue in Chicago. The two exchanged signs with their hands. Then one person pulled out a gun and began shooting at the other. The second man turned and ran. Stamps described the shooter to the police as an African-American male with a fair complexion, wearing a jacket and skullcap. Stamps saw a lineup on March 3, 1996, but did not identify the shooter.

The evidence at trial also showed that four shell casings were found at the scene of the shooting. The autopsy performed on the victim, Ronald Samuel, showed seven gunshot entry wounds in his back.

Chicago police detective David Jarmusz testified as an expert on street gangs. He testified that the Gangster Disciples are rivals of the Blackstones. He also testified that a "shorty" is a new member in a gang, a "soldier" is a recognized member who has earned the respect of other members, and a "coordinator" oversees both shorties and soldiers. Jarmusz explained that "false flagging" is when a gang member uses a rival gang's hand signals to get rival gang members to identify themselves.

The testimony of Detective Siwek, Officer Schaefer and Detective Solecki was substantially similar to their testimony at the suppression hearing.

Assistant State's Attorney O'Reilly's testimony about the circumstances surrounding defendant's confession was also similar to his

testimony at the suppression hearing. At trial, O'Reilly further testified to the contents of defendant's confession.

Defendant told O'Reilly that he and Niles Davis were sent home early from school on February 29, 1996, because a funeral for a member of the Blackstones was scheduled. Members of the Blackstones planned to march around the school, which was in Blackstone territory. Defendant, Davis and many others who attended the school were members of the Gangster Disciples. Defendant was a "shorty" in the gang, and Davis was a "coordinator." Defendant explained that the coordinator oversees the rookie members.

After leaving school on February 28, defendant and Davis went shopping at 79th Street and Marquette Avenue in Chicago. A member of the Blackstones shot at them as they came out of a store but hit a man in a telephone booth.

On February 29, 1996, defendant and Davis left school at about 3 p.m. Davis got a .25-caliber automatic gun from his house and gave it to defendant. As they walked toward 79th Street, they met several other Gangster Disciples. Defendant and Davis explained to the others that they were going to shoot a Blackstone in retaliation for the shooting the day before. The other members agreed to join them and act as "security," looking out for rival gang members and police.

Defendant and the others were walking down Colfax when they saw the victim, later identified as Ronald Samuel, flash a Blackstone gang hand signal at them. One of defendant's group "false flagged" the Blackstone signal. Defendant approached Samuel and spoke to him. Both defendant and Samuel identified themselves as Blackstones. Samuel turned to walk away. Defendant pulled the gun from his pocket and shot at Samuel four or five times. Defendant gave the gun to one of the other Gangster Disciples and they all ran away in different directions. Defendant later retrieved the gun and returned it to Davis.

Defendant said that the officers had treated him "nicely" while he was in custody. He had been given food and was allowed to use the rest room. He said his statement was given freely and voluntarily. O'Reilly testified that he was not aware that defendant's mother was in the police station.

Jeanette Golden also testified at trial consistent with her testimony at the suppression hearing.

The jury found defendant guilty of first-degree murder. At the sentencing hearing, several witnesses testified in mitigation that defendant was an intelligent, talented, responsible role model who exhibited great potential and maturity during the two years he was in the juvenile detention center and participated as an actor and writer in music theater workshops. In aggravation, the State presented the victim impact statements of Ronald Samuel's mother and two sisters.

The court noted that the only statutory aggravating factor was that the shooting was gang-related. The court considered defendant's talent, youth, rehabilitative potential and lack of criminal background, as well as his history of substance abuse and the severity of the crime. The trial court sentenced defendant to a 40-year prison term.

Defendant argues on appeal that his motion to suppress should have been granted because his statement was not made intelligently, knowingly and voluntarily. Defendant notes that he was 14 years old at the time of his arrest, he was "borderline intelligent" and his mother was prevented from seeing him until after he made his statement. We have been unable to find authority for the trial court's redaction of defendant's signature as an appropriate cure for the execution of the statement while defendant's mother was in the station but before he had an opportunity to consult with her. So we will review the issue under the guidelines set down by the supreme court for admission of a juvenile's confession made before he was allowed to consult with a parent. *In re G.O.*, 191 Ill. 2d 37, 727 N.E.2d 1003 (2000).

•1 Although we will reverse a trial court's findings of historical fact only if they are against the manifest weight of the evidence, we review *de novo* the ultimate question of whether a confession was voluntary. *G.O.*, 191 Ill. 2d at 50, 727 N.E.2d at 1010. We consider the totality of the circumstances to decide whether a confession was voluntary. *G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. "Factors to consider include the [juvenile's] age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises." *G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012, citing *People v. Gilliam*, 172 Ill. 2d 484, 500-01, 670 N.E.2d 606, 614 (1996). Also relevant is the "concerned adult" factor: whether the juvenile, before or during interrogation, had an opportunity to consult with an adult interested in his welfare. This factor is especially relevant "in situations in which the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with his parents or another 'concerned adult,' or the police prevent the juvenile's parents from speaking with him." *G.O.*, 191 Ill. 2d at 55, 727 N.E. 2d at 1012-13. No single factor is dispositive, and the failure to confer with a parent before or during interrogation does not *per se* render a juvenile's statement involuntary. *G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1013; *People v. Gilliam*, 172 Ill. 2d 484, 500, 670 N.E.2d 606, 614 (1996).

•2 Here, defendant was 14 years old at the time of his arrest. Al-

though defendant testified at the suppression hearing that he was not advised of his rights and that he was physically and verbally coerced, the police officers and the assistant State's Attorney testified that defendant was repeatedly advised of his constitutional rights, both when he was arrested and each time he was questioned. Defendant said he understood his rights. It is the function of the trial court to determine credibility and the weight and inferences to be drawn from the evidence. *People v. Steidl*, 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845 (1991).

•3 Defendant also relies on the stipulated testimony of the psychiatrists who tested and examined him to support his argument that he did not have the mental capacity to understand *Miranda* warnings. It is the trial court's role to decide what weight to give psychiatric expert testimony. *People v. Randle*, 277 Ill. App. 3d 788, 798, 661 N.E.2d 370, 377 (1995).

•4 Here, the evidence supports the trial court's finding that defendant was advised of his rights and understood them. The trial judge said, "[Y]ou look at the statement and the context, a person who is able to understand questions and responds to them in a meaningful way. It's not just parroting a bunch of statements. Now it's not the person who lacks understanding of what's going on." Defendant was not handcuffed during the interrogation, was given food and drink and was allowed to use the restroom. Defendant said in his court-reported statement that the police treated him "nicely." The trial court found that the photograph taken of defendant at the time of his statement showed "no sign of any physical abuse."

Defendant did not demonstrate difficulty understanding the interrogation process, nor did he ask to see or speak to his mother. The record shows that defendant made an oral confession before his mother arrived at the station. Considering the totality of the circumstances, defendant's confession was voluntary.

•5 However, we find no precedent for the trial court's suppression of defendant's signature on the statement while allowing the statement itself to be admitted in evidence. In fact, the statement was published to the jury and the redacted version was included in the evidence sent to the jury room for deliberations. During deliberations, the jury sent the trial judge a note:

"(1) The copy of [defendant's] statement is not signed by anyone. (2) Is this a copy, or the original statement? (3) Does the defendant and/or the other witnesses to the statement need to sign the statement? (4) If the statement needs to be signed, may we, the jury, see the signed statement?"

The trial judge responded: "Consider only the evidence that you have received."

We are faced with a trial court ruling that appears to be inherently contradictory. On the one hand, the trial court expressed concern about the failure of the police to allow defendant to see his mother before he signed his transcribed statement. On the other hand, the court also seemed to be of the view that the oral statement made by defendant before his mother arrived at the station was voluntary. The trial court's solution was a redaction of defendant's signature from the written statement, while at the same time admitting the statement into evidence and allowing it to go to the jury as an exhibit. The result of the trial court ruling was a jury that did not know what to make of the exhibit it had been given.

The trial judge may have been able to resolve the question he created in the jurors' minds if he had followed the admonition of our supreme court in *People v. Childs*, 159 Ill. 2d 217, 233-34, 636 N.E.2d 534, 541-42 (1994), that: "(1) a jury is entitled to have its explicit legal questions answered; [and] (2) the trial court has an obligation to seek clarification of the source of the jury's confusion if the question is unclear, and to then attempt to clarify the matters of law about which the jury has manifested confusion." We note that defendant has waived review of this issue by stipulating to the judge's response and failing to object at trial or in his posttrial motion. "Where a defendant acquiesces in the circuit court's answer to the jury's question, the defendant cannot later complain that the circuit court abused its discretion." *People v. Reid*, 136 Ill. 2d 27, 38, 554 N.E.2d 174, 179 (1990); see also *People v. Barlow*, 273 Ill. App. 3d 943, 654 N.E.2d 223 (1995). But a plain error analysis is warranted, given that we have been unable to find authority for the trial court's decision to send defendant's statement to the jury with his signature redacted.

In light of our finding that the circumstances surrounding defendant's statement comport with the guidelines set out in *G.O.*, particularly the holding that the presence of a parent is only one factor to be considered in weighing the voluntariness of a statement (*G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1013), the trial court's redaction of the signature was harmless error. The defendant's statement, in our view (and in the view of the trial judge), was voluntary. The jurors were entitled to receive and weigh it.

●6 Defendant next argues that the trial court erred in finding that he failed to make a *prima facie* case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). To make a *prima facie* case, a defendant must show that "relevant circumstances" raise an inference of purposeful discrimination based on race. Relevant circumstances may include a pattern of strikes against minority venire persons; the prosecutor's questions and statements

during *voir dire* and in exercising challenges; disproportionate use of peremptory challenges against minorities; the level of minority representation in the venire as compared to the jury; whether those excluded minority venire persons were a heterogeneous group sharing race as their only common characteristic; and the race of the defendant, victim and witnesses. *People v. Hudson*, 157 Ill. 2d 401, 426, 626 N.E.2d 161, 171 (1993). A trial court's decision that a defendant has failed to establish a *prima facie* case is a finding of fact, which we will not overturn unless it is against the manifest weight of the evidence. *People v. Coleman*, 155 Ill. 2d 507, 514, 617 N.E.2d 1200, 1204 (1993).

During jury selection, the State exercised peremptory challenges against one white venire member and both of the African-American venire members in the first panel, Ms. Love and Ms. Thomas. The trial court found that defendant made a *prima facie* case for a violation of *Batson*. The State argued that Love indicated that she might be biased because her cousin had been accused of murder and that she was concerned about finding care for her children during the course of the trial. The State also argued that both Love and Thomas were inattentive during *voir dire*. The trial court found that Love was inattentive and gave inconsistent answers, valid race-neutral reasons for exercising peremptory challenges, and granted the State's challenge against Love. But the court did not find a race-neutral reason for excluding Thomas and so denied the State's peremptory challenge.

After the second panel of venire members was questioned, the State exercised peremptory challenges against one African-American male and one Hispanic male. Defendant again made a *Batson* motion, arguing that three of the State's five peremptory challenges were against African-Americans, and the fourth against a Hispanic.

The trial court found that defendant failed to make a *prima facie* case of discrimination. The court noted that the State did not challenge several African-American venire members in the second panel. The court also said that a Hispanic person could not be considered part of the same cognizable group as African-Americans. The court found no pattern of discrimination against Hispanic jurors. The only other Hispanic venire members were excused for cause on the court's own motion because one had difficulty understanding English and the other said she was biased in favor of the prosecution.

•7 Here, the trial court's finding that defendant did not establish a *prima facie* case of discrimination for the State's last two peremptory challenges was not against the manifest weight of the evidence. The trial court properly recognized that the challenges against African-American and Hispanic venire members should be analyzed separately. To decide whether a *prima facie* case of racial discrimination occurred,

we must give separate consideration to different racial or ethnic groups. *People v. Harris*, 164 Ill. 2d 322, 344, 647 N.E.2d 893, 904 (1994). The trial court properly found no *prima facie* case of racial discrimination where the State exercised only one peremptory challenge against a Hispanic venire member.

We believe the trial court was also correct in finding no *prima facie* case of discrimination in the State's final peremptory challenge against an African-American. Here, the State did not challenge several other African-Americans on the panel. "To create a pattern, strikes should do more than occasionally involve venire members of a certain race. The strikes should affect those members to such a degree or with such a lack of apparent nonracial explanation as to suggest the possibility of racial motivation ***." *People v. Hope*, 137 Ill. 2d 430, 463, 560 N.E.2d 849, 864 (1990). Where both the defendant and the victim are African-American, their racial characteristics do not warrant an inference, at the *prima facie* stage, that the prosecution discriminated against venire members who were African-American. *People v. Figgs*, 274 Ill. App. 3d 735, 745, 654 N.E.2d 555, 563 (1995), citing *People v. Henderson*, 142 Ill. 2d 258, 289, 568 N.E.2d 1234, 1249 (1990).

●8 Defendant's final argument is that his 40-year sentence is excessive. He argues that the trial court failed to consider his age, potential for rehabilitation, limited mental capacity and emotional and psychological problems.

Sentencing issues not raised by objection in the trial court and in a postsentencing motion are waived on appeal. *People v. Reed*, 177 Ill. 2d 389, 394, 686 N.E.2d 584, 586 (1997). We will not reverse absent a showing that the trial court abused its discretion in imposing the sentence. *People v. Beals*, 162 Ill. 2d 497, 512, 643 N.E.2d 789, 796 (1994). Defendant has not filed a postsentencing motion, but argues that the trial court committed plain error in sentencing him to a 40-year prison term. Under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), we may recognize plain errors affecting substantial rights even when not brought to the attention of the trial court.

Defendant argues that the sentence is not commensurate with his rehabilitative potential, as testified to by the witnesses in mitigation. Those witnesses, all of whom interacted with defendant during his time at the juvenile detention center, described him as intelligent, cooperative and hard-working. They testified that he wrote and acted in plays as part of a music theater workshop.

Defendant also argues that his sentence does not reflect that he was only 14 years old at the time of the shooting, had an IQ score of 79, and tested poorly in reading comprehension. He also suffered from depression after the deaths of his father, brother and cousin in 1991.

We find no plain error in this case. The evidence showed that, in a planned act of retaliation for an earlier shooting, defendant fired seven shots into the back of an unarmed victim who was running away from him. The trial court is in the best position to observe the defendant and consider factors such as credibility, demeanor, moral character, mentality, social environment, habits and age. *People v. Streit*, 142 Ill. 2d 13, 19, 566 N.E.2d 1351, 1353 (1991). The trial judge's lengthy comments at the sentencing hearing show that he weighed both aggravating and mitigating evidence before imposing a sentence.

The seriousness of the crime is an important factor to be considered in imposing sentence. *People v. Costello*, 224 Ill. App. 3d 500, 510, 586 N.E.2d 742, 749 (1992). "A sentence within the statutory guidelines that is alleged to be excessive will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense." *Costello*, 224 Ill. App. 3d at 510, 586 N.E.2d at 749, citing *People v. Cabrera*, 116 Ill. 2d 474, 493-94, 508 N.E.2d 708, 716 (1987). The trial court did not abuse its discretion in imposing a 40-year sentence in this case.

We affirm the judgment of the circuit court.

Affirmed.

GORDON and McBRIDE, JJ., concur.